754 A.2d 367

## HOUSING AUTHORITY OF BALTIMORE CITY

v.

## Crystal BENNETT.

No. 96, Sept. Term, 1998.

Court of Appeals of Maryland.

June 6, 2000.

Reconsideration Denied July 21, 2000.

J. Marks Moore, III (Charles M. Delacruz, Kathleen E. Wherthey, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, on brief), Baltimore, for Housing Authority of Baltimore City.

Scott E. Nevin (Saul E. Kerpelman, on brief), Baltimore, for respondents.

David M. Funk, Charles D. MacLeod, Funk & Bolton, P.A., Baltimore, amicus curiae for Local Government Ins. Trust.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW *, RAKER, WILNER and CATHELL, JJ.

ELDRIDGE, Judge.

The Local Government Tort Claims Act (LGTCA), Maryland Code (1974, 1998 Repl.Vol., 1999 Supp.), §§ 5–301 through 5–304 of the Courts and Judicial Proceedings Article, makes all entities defined therein as "local governments" responsible for the legal defense of their employees, and liable for judgments for compensatory damages rendered against their employees, in suits against the employees based on tortious acts committed in the scope of their governmental employment. In addition, the LGTCA prohibits local governments from asserting the defense of governmental immunity to avoid this responsibility and liability, and it establishes

---

\* Chasanow, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

monetary caps per individual claim and occurrence on the recoverable damages.

This case concerns the scope of the LGTCA's caps on damages. In particular, the case at bar requires us to decide whether the damages cap provision applies to a judgment against a local government agency in a tort action which is authorized by another statute enacted by the General Assembly prior to the LGTCA and reenacted after the LGTCA.[1]

## I.

To understand the underlying issue in this case, namely to what extent the LGTCA's caps on damages affect local government tort liability under other law, and the tort liability of housing authorities in particular, it would be useful to summarize the status of local governmental immunity from suit up to and including the enactment of the LGTCA and its amendment pertaining to housing authorities.

## A.

Unlike the sovereign immunity of the State and its agencies, which has been addressed by the General Assembly at various times in the history of Maryland, the matter of local government immunity prior to enactment of the LGTCA was shaped largely by judicial decisions and by statutes dealing with specific agencies or specific matters. *See Austin v. City of Baltimore*, 286 Md. 51, 69–72, 405 A.2d 255, 264–266 (1979) (concurring and dissenting opinion). Until the twentieth century, local governments generally had no immunity under Maryland common law in either tort or contract actions. *Austin*, 286 Md. at 71–78, 405 A.2d at 265–269. There is still no common law local governmental immunity in contract ac-

---

1. Although the LGTCA has undergone some modifications since its enactment in 1987, the changes have not affected the language regarding the scope of the damages caps at issue in the case at bar. Accordingly, all citations to and quotations from the LGTCA are to Maryland Code (1974, 1998 Repl.Vol., 1999 Supp.), §§ 5–301 to 5–304 of the Courts and Judicial Proceedings Article.

tions. *See Harford County v. Bel Air,* 348 Md. 363, 372–373, 704 A.2d 421, 425–426 (1998), and cases there cited.

In the early twentieth century, however, this Court adopted a distinction that had been developed earlier in other jurisdictions, and held that local governments enjoyed immunity in certain types of tort actions based on activity categorized as "governmental" but had no immunity in tort actions based on activity categorized as "private" or "corporate" or "proprietary." *See Austin,* 286 Md. at 71–78, 405 A.2d at 265–269 (concurring and dissenting opinion), and cases there cited. *See also DiPino v. Davis,* 354 Md. 18, 47, 729 A.2d 354, 369–370 (1999) ("A local governmental entity is liable for its torts if the tortious conduct occurs while the entity is acting in a private or proprietary capacity, but, unless its immunity is legislatively waived, it is immune from liability for tortious conduct committed while the entity is acting in a governmental capacity"); *Harford County v. Bel Air, supra,* 348 Md. at 373, 704 A.2d at 426; *Ashton v. Brown,* 339 Md. 70, 101, 660 A.2d 447, 462–463 (1995); *Board v. Town of Riverdale,* 320 Md. 384, 389–390, 578 A.2d 207, 210 (1990), and cases there cited.

 Moreover, this governmental-proprietary distinction has no application to certain types of tort actions, and local governments have no immunity in those actions. Thus, local governments have no immunity from liability in nuisance actions. *See Board v. Town of Riverdale, supra,* 320 Md. at 388, 578 A.2d at 209, citing *Tadjer v. Montgomery County,* 300 Md. 539, 550, 479 A.2d 1321, 1326 (1984) ("In Maryland, counties and municipalities have never been accorded immunity from nuisance suits"). *See also Harford County v. Bel Air, supra,* 348 Md. at 373, 704 A.2d at 425–426. In addition, local governments have no immunity in tort actions based on violations of the Maryland Constitution. *See DiPino v. Davis, supra,* 354 Md. at 50–51, 729 A.2d at 371; *Harford County v. Bel Air, supra,* 348 Md. at 373, 704 A.2d at 426; *Ashton v. Brown, supra,* 339 Md. at 101–102, 106, 660 A.2d at 462–463, 465; *Board v. Town of Riverdale, supra,* 320 Md. at 389, 578 A.2d at 210; *Clea v. City of Baltimore,* 312 Md. 662, 667–668

n. 3, 541 A.2d 1303, 1305 n. 3 (1988), and cases there cited. Local governments also lack immunity from tort liability for violations of federal constitutional or statutory rights. Under 42 U.S.C. § 1983, local governments, unlike state governments, may be sued when a local governmental statute, regulation, policy, or custom causes the alleged deprivation of federal rights. See *DiPino*, 354 Md. at 45–47, 729 A.2d at 368–369, and cases there cited; *Ashton*, 339 Md. at 110–113, 660 A.2d at 467–468, and cases there cited.

Prior to enactment of the LGTCA, the common law governmental immunity of local governments, based on activity categorized as "governmental," was waived under specific circumstances by various enactments of the General Assembly. One example of such a statute is Code (1957, 1998 Repl.Vol.), Article 44A, wherein the General Assembly authorized the creation of housing authorities, including the petitioner in the case at bar, the Housing Authority of Baltimore City. In *Jackson v. Housing Opp. Comm'n*, 289 Md. 118, 422 A.2d 376 (1980), this Court considered the viability of a personal injury action brought against the Housing Opportunities Commission of Montgomery County for negligence in failing to maintain safely the premises of a housing project. In determining whether the housing authority in that case was entitled to the defense of governmental immunity, we construed various sections of Art. 44A as effecting a limited waiver of any governmental immunity which the housing authority might otherwise enjoy. Separate provisions of Article 44A authorized housing authorities to sue and to be sued, mandated that no judgments against housing authorities could be executed against real property owned by the authorities, required the authorities to purchase liability insurance coverage for their operations against any risks or hazards, and directed the authorities to include the cost of such liability insurance in their operating costs to be covered by the rents they charged. Considering these statutory provisions together, this Court held that, "by necessary and compelling implication," Art. 44A effected a waiver of the defense of governmental immunity, but only to the extent of the "applicable limits" of a housing authority's

liability insurance policy. *Jackson,* 289 Md. at 130, 422 A.2d at 382. In other words, Art. 44A both waived any governmental immunity which a housing authority might otherwise enjoy and capped its liability at the extent of its liability insurance.

Also prior to the enactment of the LGTCA, local governments occasionally waived any governmental immunity which they might otherwise enjoy under the common law. For example, the Express Powers Act, Code (1957, 1998 Repl.Vol.), Art. 25A, § 5(S), as construed in *Bradshaw v. Prince George's County,* 284 Md. 294, 297–299, 396 A.2d 255, 258–259 (1979),[2] authorizes charter counties to waive governmental immunity. The now repealed § 5(CC) of Art. 25A limited such waivers of governmental immunity to the greater of $250,000 or the amount of insurance coverage.[3] Prince George's County, in § 1013 of its first charter, adopted in 1970, waived its governmental immunity pursuant to § 5(S) of the Express Powers Act. *See Bradshaw v. Prince George's County, supra.*

Therefore, prior to the enactment of the LGTCA, local governments enjoyed immunity from tort liability only with respect to nonconstitutional torts based on activity categorized as "governmental." Moreover, such immunity could be waived by enactments of the General Assembly or by local enactments.

### B.

In 1987 the General Assembly enacted Ch. 594 of the Acts of 1987 which affected the tort liability of local governments in several ways. As previously noted, *supra* n. 3, § 1 of Ch. 594 repealed § 5(CC) of Art. 25A, which had placed monetary caps upon waivers of governmental immunity by charter counties. Section 1 of Ch. 594 also repealed Code (1974, 1984 Repl.Vol.,

---

**2.** Overruled on other grounds by *James v. Prince George's County,* 288 Md. 315, 418 A.2d 1173 (1980).

**3.** Section 5(CC) of the Express Powers Act, Code (1957, 1981 Repl.Vol., 1986 Cum.Supp.), Art. 25A, was repealed by § 1 of Ch. 594 of the Acts of 1987, which also enacted the LGTCA.

1986 Cum.Supp.), § 5–306 of the Courts and Judicial Proceedings Article, which had set forth notice requirements pertaining to any claim for unliquidated damages in an action for personal injury or property damage brought against a county or municipal corporation. In addition, § 1 of Ch. 594 enacted the LGTCA.

The first section of the LGTCA, *inter alia,* defines "local government" very broadly to include, not only counties and municipalities, but also such entities as the Maryland–National Capital Park and Planning Commission, the Washington Suburban Sanitary Commission, special taxing districts, public libraries, the Enoch Pratt Free Library, and community colleges and their boards of trustees. *See* Code (1974, 1998 Repl.Vol., 1999 Suppl.), § 5–301(d) of the Courts and Judicial Proceedings Article. The second section of the LGTCA requires all entities defined as "local governments" to provide a legal defense for employees in tort actions alleging tortious conduct committed in the scope of employment. § 5–302(a). This section further directs that no judgment can be executed against an employee in such a tort action unless the employee was found to have acted with actual malice, in which case the employee is fully liable for all damages awarded and the local government may seek indemnification for any damages it has paid. § 5–302(b).

The third section contains the monetary caps ($200,000 per individual claim and $500,000 per total claims arising from the same occurrence, § 5–303(a)(1)), mandates that a local government is liable to pay any judgment in a tort action brought against its employee for tortious conduct committed in the scope of employment (§ 5–303(b)(1)), deals with liability for punitive damages (§ 5–303(c)(1)), and provides that a local government may not raise the defense of its own governmental immunity to avoid the statutory duties to defend or indemnify its emplóyees (§ 5–303(b)(2)).

The fourth section contains notice requirements for unliquidated damages actions against local governments or their employees (§ 5–304). These are essentially the same notice

requirements which had existed under the prior law which was repealed by Ch. 594. In addition to § 1, Ch. 594 included an uncodified § 2 which repealed all prior *local* government enactments inconsistent with Ch. 594. Section 2 reads as follows:

"SECTION 2. AND BE IT FURTHER ENACTED, That any provision or portion of a statute, law, ordinance, or charter provision enacted by a local government which is inconsistent with any provision of this Act is repealed."

The language of this repealer section is unusual in that it does not state that Ch. 594 repeals all prior inconsistent enactments; it repeals only those enacted by local governments.

In 1988 the LGTCA was amended to include Art. 44A housing authorities within the statute's definition of "local government." *See* Ch. 323 of the Acts of 1988; Code (1974, 1998 Repl.Vol., 1999 Suppl.), § 5–301(d)(15) of the Courts and Judicial Proceedings Article. Art. 44A remained unchanged until 1990, when the General Assembly enacted Ch. 330 of the Acts of 1990. *See* Code (1957, 1998 Repl.Vol.), Art. 44A. Chapter 330 repealed Articles 44A and 44B, the Housing Authorities and Housing Cooperation Laws respectively, and reenacted them, with modifications, into Article 44A, entitled Housing Authorities. The new Art. 44A reenacted, without any pertinent substantive modifications, the sections construed in *Jackson v. Housing Opp. Comm'n, supra,* as effecting a limited waiver of any governmental immunity which housing authorities might otherwise enjoy. Chapter 330 did, however, contain a new section stating that all employees of housing authorities are local government employees for the purposes of the LGTCA and entitled to its protections. Art. 44A, § 1–211(a)(2).

As earlier stated, the single issue presented by the case at bar is whether the LGTCA's damages cap provision limits the liability of a local government in a tort action in which the local government itself is a defendant and is subject to a limited waiver of immunity effected by an enactment of the

General Assembly which is separate and distinct from the LGTCA.[4]

## II.

This case arose out of the lead poisoning of Crystal Bennett, a minor, who lived with her grandmother and legal guardian, Margaret Webb, at 751 Cator Avenue, Baltimore, Maryland, a residence owned and managed by the Housing Authority of Baltimore City. Bennett was born on July 29, 1987, and lived at 751 Cator Avenue until July 1994. In July 1988, Bennett was tested for exposure to lead-based paint at the University of Maryland and was diagnosed with an elevated blood-lead level. Both before and after Bennett's birth, Webb had complained to the Housing Authority about problems that needed repair, including chipping and flaking paint.

In September 1994, Webb and Bennett filed in the Circuit Court for Baltimore City a complaint alleging, *inter alia*, that the Authority was negligent in allowing flaking lead-based paint to remain at 751 Cator Avenue and that this negligence resulted in permanent injuries to Bennett and medical expenses incurred by Webb.[5] The plaintiffs sought damages totaling several million dollars based on the negligence claims. In March 1996, the Authority filed a motion requesting that the Circuit Court limit the Authority's liability to the $200,000

---

**4.** Both *DiPino v. Davis,* 354 Md. 18, 729 A.2d 354 (1999), and *Ashton v. Brown,* 339 Md. 70, 660 A.2d 447 (1995), involved common law and state constitutional tort claims against local governments and employees as well as claims pursuant to 42 U.S.C. § 1983. Both opinions discussed briefly the LGTCA's effect on local government liability and the scope of the damages cap provision. Nevertheless, in contrast to the case at bar, this Court was not presented with the issue of damages in either *DiPino* or *Ashton,* and, thus, neither prior case contained a holding on the scope of the damages cap provision.

**5.** The complaint also contained counts alleging strict liability, requesting punitive damages, and alleging violation of Maryland's Consumer Protection Act (CPA). The Circuit Court disposed of these counts in the Authority's favor before trial, granting the Authority's motion to dismiss regarding strict liability and punitive damages and granting its motion for summary judgment concerning the alleged violation of the CPA.

per individual claim established by § 5–303 of the LGTCA. The Circuit Court granted this motion in May 1996.

The case proceeded to trial in November 1996. At the close of all the evidence, the Circuit Court held that Webb's individual claims were barred by the three-year statute of limitations. *See* Code (1974, 1998 Repl.Vol.), § 5–101 of the Courts and Judicial Proceedings Article. Only Bennett's negligence claim was submitted to the jury. After deliberation, the jury returned a verdict of $630,000 in favor of Bennett. The Authority then moved to reduce the verdict to the LGTCA's $200,000 cap in accordance with the May 1996 order. The Circuit Court granted the motion over Bennett's objection and entered judgment against the Authority for $200,000.

In a motion to alter or amend the judgment, Bennett argued that the LGTCA does not apply to judgments against local governments, as opposed to judgments against employees for which local governments are held liable under the LGTCA. Bennett contended that the applicable law regarding the Authority's liability is set forth in *Jackson v. Housing Opp. Comm'n, supra,* where this Court construed the Housing Authorities Law, Code (1957, 1998 Repl.Vol.), Article 44A, as waiving the governmental immunity which a housing authority might otherwise enjoy and capping its liability at the amount of available insurance.[6] Bennett asserted that she was enti-

---

**6.** The Court in *Jackson v. Housing Opp. Comm'n* stated that it need not reach the issue of whether the housing authority in question was a state agency whose sovereign immunity had been waived or a local government agency whose governmental immunity had been waived. 289 Md. 118, 120, 422 A.2d 376, 377 (1980). The Court also noted that the appellants failed to contend that, if the housing authority was a local government agency, it exercised proprietary functions and, therefore, would have no governmental immunity to be waived. *Ibid.* As discussed previously, in 1988 the General Assembly defined housing authorities created under Code (1957, 1998 Repl.Vol.), Art. 44A, as local governments for the purposes of the LGTCA. *See* Ch. 323 of the Acts of 1988; Code (1974, 1998 Repl.Vol., 1999 Suppl.), § 5–301(d)(15) of the Courts and Judicial Proceedings Article. As Art. 44A waived any immunity which a housing authority might otherwise have, and capped tort liability at the amount of insurance, there is no need to discuss, and neither party in the case at bar has raised, the issue of whether Art. 44A

tled to a verdict of $500,000 because the Housing Authority of Baltimore City had a general liability insurance policy which included coverage for lead paint exposure liability up to $500,-000. In a March 13, 1997, order, the Circuit Court granted Bennett's motion in part and entered judgment against the Authority for $350,000. In an opinion accompanying the order, the trial judge explained that the judgment was limited to the amount of insurance available to the extent that the amount fell within the statutory limit for noneconomic damages resulting from personal injuries. See Code (1974, 1998 Repl.Vol.), § 11–108(b) of the Courts and Judicial Proceedings Article. As Bennett was first diagnosed with an elevated blood-lead level in 1988, her claim arose in that year and her "noneconomic" damages were limited to the $350,000 cap established for that year.[7]

The Authority then filed a motion to alter or amend the judgment, requesting that the amount of the judgment be reduced to reflect the funds remaining under its insurance policy and also requesting an evidentiary hearing to establish this amount. The Authority contended that about $338,000 of the $500,000 limit was available to satisfy Bennett's judgment because the $500,000 limit was a per claim and aggregate limit subject to reduction by defense costs for all actions brought against the Authority during the policy period. On April 18, 1997, the trial judge issued an order denying the Authority's motion.

The Authority timely noted an appeal to the Court of Special Appeals, arguing, *inter alia,* that its liability was limited to the *lesser* of either the LGTCA's cap of $200,000 or the extent of its available insurance. In this case, the Authori-

---

housing authorities exercise proprietary rather than governmental functions:

7. No issue has been raised in this case regarding the trial court's holding that all of Bennett's damages are subject to the statutory cap on "noneconomic" damages. Both sides have proceeded on the assumption that all of Bennett's damages are subject to the cap on noneconomic damages.

ty concluded that the LGTCA's cap would apply because there was "more than $200,000 of insurance money available to pay Bennett's judgment."

The Court of Special Appeals, in an unreported opinion, upheld the Circuit Court's holding as to the inapplicability of the LGTCA's cap to Bennett's action, but vacated the judgment and remanded the case to the Circuit Court for an evidentiary hearing to determine the amount of insurance money available to satisfy the judgment against the Authority. The intermediate appellate court also held that, in arriving at the amount of insurance money available within the limitation established by the $350,000 statutory cap on noneconomic damages, the Authority's defense costs must be deducted from its $500,000 coverage for lead paint exposure liability and not from the $350,000 cap.

Thereafter the Authority filed in this Court a petition for a writ of certiorari, raising the single issue of "[w]hether the extent of HABC's [the Authority's] waiver of sovereign immunity and resulting liability is the available amount of any purchased insurance or the $200,000 Local Government Tort Claims Act cap?" (Petition for a writ of certiorari at 2). The Authority contended "that the liability of HABC is the lesser of either the LGTCA $200,000 cap or the extent of its available insurance." (*Id.* at 9). The respondent did not file a cross-petition for a writ of certiorari. We granted the Authority's petition, *Housing Authority v. Bennett*, 351 Md. 161, 717 A.2d 384 (1998), and we shall affirm the judgment of the Court of Special Appeals.

### III.

The Authority argues that both the language and the legislative history of the LGTCA reflect the General Assembly's intent to cap the liability of local governments at the limits set forth in the LGTCA, regardless of whether the judgment is for compensatory damages rendered against an employee for a tort committed in the scope of employment or whether the judgment is against the local government itself pursuant to

state law separate and distinct from the LGTCA. According to the Authority, when the judgment is against a local government agency itself pursuant to a state law such as Art. 44A, the applicable cap on damages is the lesser of either the cap under the LGTCA or the cap under the other state law.

■ The respondent, on the other hand, argues that the LGTCA does not affect the governmental immunity of a local government itself and that, therefore, the caps on liability in the LGTCA have no application to suits against the local government or an agency thereof. According to the respondent Bennett, "the LGTCA applies to suits against employees of local governments only. To now read more into the Act, is creating something that simply does not exist." (Respondent's brief at 5). Alternatively, the respondent argues that even if the LGTCA's $200,000 cap on damages were to apply to actions against a government agency pursuant to a separate and distinct state law, the respondent's exposure to flaking and chipping lead paint, and her resulting brain damage, occurred prior to the effective date of Ch. 323 of the Acts of 1988 which brought Art. 44A housing authorities within the LGTCA's definition of "local government." In light of our holding that the LGTCA's damages cap provision does not apply to tort actions directly against an Art. 44A housing authority, we need not reach the respondent's alternative contention.

## A.

Sections 5–302 and 5–303 of the LGTCA provide in relevant part as follows:

" § 5–302 **Nature and extent of legal representation.**

"(a) *Government to provide legal defense to employees.*— Each local government shall provide for its employees a legal defense in any action that alleges damages resulting from tortious acts or omissions committed by an employee within the scope of employment with the local government.

"(b) *Immunity; exceptions.*—(1) Except as provided in paragraph (2) of this subsection, a person may not execute against an employee on a judgment rendered for tortious acts or omissions committed by the employee within the scope of employment with a local government.

"(2)(i) An employee shall be fully liable for all damages awarded in an action in which it is found that the employee acted with actual malice.

\* \* \*

" § 5–303 **Liability of government; defenses.**

"(a) *Limitation on liability.*—(1) . . . the liability of a local government may not exceed \$200,000 per an individual claim, and \$500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions, including liability arising under subsection (b) of this section. . . .

\* \* \*

"(b) *When government liable.*—(1) Except as provided in subsection (c) of this section, a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.

"(2) A local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection.

"(c) *Punitive damages; indemnification.*—(1) A local government may not be liable for punitive damages.

"(2)(i) Subject to subsection (a) of this section and except as provided in subparagraph (ii) of this paragraph, a local government may indemnify an employee for a judgment for punitive damages entered against the employee.

"(ii) A local government may not indemnify a law enforcement officer for a judgment for punitive damages if the law

enforcement officer has been found guilty under Article 27, § 731 of the Code as a result of the act or omission giving rise to the judgment, if the act or omission would constitute a felony under the laws of this State.

"(3) A local government may not enter into an agreement that requires indemnification for an act or omission of an employee that may result in liability for punitive damages.

"(d) *Defenses not waived.*—Notwithstanding the provisions of subsection (b) of this section, this subtitle does not waive any common law or statutory defense or immunity in existence as of June 30, 1987 [the effective date of the LGTCA], and possessed by an employee of a local government.

"(e) *Defenses available to government.*—A local government may assert on its own behalf any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by its employee for whose tortious act or omission the claim against the local government is premised and a local government may only be held liable to the extent that a judgment could have been rendered against such an employee under this subtitle."

The Authority contends that the phrase "tortious acts or omissions, including liability arising under subsection (b)" in § 5–303(a)(1) demonstrates a legislative intent to make the monetary caps applicable to judgments against local governments themselves and not solely to the judgments against employees described in § 5–303(b)(1). As the Authority states, "[t]he use and placement of the word 'including' in subsection (a) makes plain that the potential liability of a local government being referred to includes, but is not limited to, liability for the torts of its employees." (Petitioner's brief at 8).

Even if the word "including" is read as containing the phrase "not limited to," there is no indication in the language of §§ 5–301 through 5–303 of how far beyond the § 5–303(b) liability for judgments against employees the caps were meant to extend or what additional liability might be encompassed.

The *only* liability mentioned in §§ 5–301 through 5–303 is the local government's liability to provide a defense in actions against its employees, the liability to pay judgments rendered against its employees, and the liability to "indemnify" its employees. There is no reference in these sections to actions or judgments directly against local governments.

The only references in the LGTCA to actions directly against local governments are contained in the notice provision set forth in § 5–304, which, as previously mentioned, was taken from a notice statute which pre-dated the LGTCA. Moreover, the language of the § 5–304 notice provision demonstrates that, when the General Assembly intended a provision of the LGTCA to apply to actions against employees *or* actions against local governments, it knew how to say so. Section 5–304(a) states as follows (emphasis added):

"(a) *Notice required.*—Except as provided in subsection (c) of this section, an action for unliquidated damages may not be brought *against a local government or its employees* unless the notice of the claim required by this section is given within 180 days after the injury."

There is no comparable language "against a local government or its employees" in § 5–303 which contains the monetary caps.

The authority's argument is based on the meaning of a single word in § 5–303, "including," which is somewhat ambiguous. Although this Court has stated that " '[o]rdinarily, the word "including" means comprising by illustration and not by way of limitation,' " *State v. Wiegmann*, 350 Md. 585, 593, 714 A.2d 841, 845 (1998), quoting *Group Health Ass'n v. Blumenthal*, 295 Md. 104, 111, 453 A.2d 1198, 1203 (1983), we have also recognized that, "[w]hile 'include' or 'including' may introduce illustrations of a general term, the words also may signal an expansion in meaning of previous language." *Pacific Indem. v. Interstate Fire & Cas.*, 302 Md. 383, 396, 488 A.2d 486, 492 (1985). We went on in the *Pacific Indem.* case, 302 Md. at 397, 488 A.2d at 493, to quote *Black's Law Dictionary* as follows:

*"Black's Law Dictionary* (5th ed.1979) defines 'include' as '[t]o confine within, hold as in an inclosure, take in, attain, shut up, contain, inclose, comprise, comprehend, embrace, involve. Term may, according to context, express an enlargement and have the meaning of *and* or *in addition to,* or merely specify a particular thing already included within general words theretofore used. 'Including' within statute is interpreted as a word of enlargement or of illustrative application as well as a word of limitation. [Emphasis in original.]' "

The *Pacific Indem.* case concluded that the words "include" or "including," as used in the insurance policy involved in that case, were ambiguous.

It is generally held that the meaning of the words "including" or "includes" depends upon the context and that sometimes they are not words of illustration or enlargement. *See Helvering v. Morgan's, Inc.,* 293 U.S. 121, 125, 55 S.Ct. 60, 61, 79 L.Ed. 232, 235 (1934) ("It may be admitted that the term 'includes' may sometimes be taken as synonymous with 'means' "); *Frame v. Nehls,* 452 Mich. 171, 178–179, 550 N.W.2d 739, 742 (1996) ("When used in the text of a statute, the word 'includes' can be used as a term of enlargement or of limitation, and the word in and of itself is not determinative of how it is intended to be used"); *Premier Products Co. v. Cameron,* 240 Or. 123, 125, 400 P.2d 227, 228 (1965) ("How [including] is interpreted depends upon several factors,—context, subject matter, possible legislative intention, etc."). *See also, e.g., Television Transmission v. Public Utilities Comm'n,* 47 Cal.2d 82, 85, 301 P.2d 862, 863 (1956); *Surowitz v. City of Pontiac,* 374 Mich. 597, 132 N.W.2d 628 (1965); *State v. Sho–Me Power Co-op.,* 354 Mo. 892, 191 S.W.2d 971 (1946); *Application of Central Airlines,* 199 Okla. 300, 185 P.2d 919 (1947); *Powers v. Charron,* 86 R.I. 411, 135 A.2d 829 (1957); *Morris Friedman & Co. v. United States,* 69 Cust.Ct. 184, 351 F.Supp. 611 (1972).

This Court has repeatedly pointed out that words in a statute must be interpreted in the context of the statute as a

whole. *See, e.g., Gordon Family v. Gar,* 348 Md. 129, 138, 702 A.2d 753, 757 (1997); *Blondell v. Baltimore Police,* 341 Md. 680, 691, 672 A.2d 639, 645 (1996); *Curran v. Price,* 334 Md. 149, 172, 638 A.2d 93, 104 (1994); *State v. Crescent Cities Jaycees,* 330 Md. 460, 468, 624 A.2d 955, 959 (1993); *Forbes v. Harleysville Mutual,* 322 Md. 689, 696–697, 589 A.2d 944, 947–948 (1991); *Kaczorowski v. Baltimore,* 309 Md. 505, 513–516, 525 A.2d 628, 632–633 (1987).

In the context of the LGTCA, we do not believe that the monetary limitation, by use of the word "including" with reference to liability for judgments against employees, should be construed as also applying to *all* tort judgments directly against local governments and agencies regardless of the basis for such judgments. As previously discussed, the only liability mentioned in §§ 5–301 through 5–303 is liability to provide a defense in tort actions against employees, liability to pay judgments in tort actions against employees, and liability to indemnify employees. Furthermore, limitations upon liability in a governmental tort claims act ordinarily relate to the liability created by or expressly dealt with in that tort claims act.[8] The only liabilities created by the LGTCA or expressly dealt with in the LGTCA concern tort suits against government employees.

Viewing the monetary cap provision in the context of the entire Ch. 594 of the Acts of 1987, which, *inter alia,* enacted the LGTCA, it would be a reasonable construction of Ch. 594 to extend the LGTCA's monetary caps to tort actions directly against local governments or agencies thereof when the authorizations for such tort actions were locally enacted ordinances or charter provisions. It would not be a reasonable construction of the statutory language, however, to apply the monetary caps to tort actions directly against local governments when the bases for such actions are enactments of the General

---

**8.** *See, e.g.,* the Maryland Tort Claims Act, Maryland Code (1984, 1999 Repl.Vol.), §§ 12–101 *et seq.* of the State Government Article, and the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680.

Assembly, state common law, the state constitution, or federal law.

This dichotomy between locally enacted law and state law is reflected in the uncodified § 2 of Ch. 594 and in that portion of § 1 of Ch. 594 which repealed the Express Powers Act's caps when charter counties themselves waived governmental immunity. Unlike a typical clause repealing prior inconsistent laws, which repeals *all* prior inconsistent laws, § 2 of Ch. 594 repealed only inconsistent laws and charter provisions "enacted by a local government." Consequently, the inconsistent monetary cap for housing authorities' tort liability, enacted by the General Assembly in Art. 44A of the Maryland Code, was plainly not affected by Ch. 594. Ch. 594 also repealed the monetary caps in the Express Powers Act when charter counties waive governmental tort immunity. These monetary caps, for locally enacted waivers of immunity, were inconsistent with the monetary caps in the LGTCA. The General Assembly, however, repealed no other *state* law relating to tort actions against local governments.

The provisions of Ch. 594 strongly suggest a legislative intent that the substantive sections of the LGTCA, including the monetary caps, apply to the actions against employees expressly dealt with in the LGTCA and also to actions directly against local governments which are authorized under locally enacted law. By the uncodified portions of Ch. 594, the General Assembly seemed to intend that the monetary caps set forth in the LGTCA take the place of any different monetary caps contained in locally enacted law. Thus, if a home rule county or a municipality by charter provision or ordinance waives its governmental tort immunity, the monetary caps in the LGTCA would appear to apply. The provisions of Ch. 594 also reflect a legislative intent, however, that, except for actions against local governmental employees, Ch. 594 did not affect tort actions under *state* law. The Legislature made a point of not repealing provisions of state law such as Art. 44A which, as construed in *Jackson v. Housing Opp. Comm'n, supra,* contains an entirely different monetary cap.

## B.

The Authority also argues that the legislative history of the LGTCA shows a legislative intent to cap the liability of local governments for all judgments in tort actions brought either against them or against their . employees. The legislative history does reveal that the local government drafters and sponsors of the original version of the LGTCA intended the cap to apply broadly. This legislative history, however, related to proposed language which was never enacted. Changes made to the LGTCA in the Senate Judicial Proceedings Committee and in the House–Senate Conference Committee drastically revised the language proposed by the statute's local government sponsors, leaving nothing but the language of the enacted statute, and the record of changes made in committees, as the only pertinent evidence of legislative intent.

In the mid–1980s, Governor Harry Hughes appointed a "Task Force to Study Liability Insurance," with Lt. Governor J. Joseph Curran, Jr., as Chairman. The Task Force "strongly" supported a proposed LGTCA which was "drafted by a select group of county attorneys with the cooperation and support of the Maryland Municipal League and the Maryland Association of Counties." *Report of the Governor's Task Force to Study Liability Insurance,* at 14 (December 1985). The Task Force described this proposed LGTCA as limiting "the amount of damages that may be assessed against a local government entity or its employees." *Id.* at 13. The original proposed LGTCA's provisions on liability read in relevant part as follows (*id.* at 56, Appendix C–2) (emphasis added):

"(A) The liability of a local government *for* damages resulting from tortious acts or omissions *or* for liability arising from subsection (B) shall not exceed $100,000.00 per occurrence.

"(B) A local government shall be liable for any judgment against an employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government."

The disjunctive language of paragraph A, with the use of the word "or," suggests that the proposed act was intended to encompass both tort suits directly against local governments and tort suits against local government employees.[9]

In both the 1986 and 1987 sessions of the General Assembly, bills were introduced which in substance reflected the above-quoted language. They provided, in the disjunctive, that the "liability of a local government may not exceed $100,000 per occurrence for: (1) damages resulting from tortious acts or omissions; or (2) liability arising under subsection (B)." In 1986 the two houses of the General Assembly disagreed about whether employees should be personally liable to pay judgments in excess of the cap for compensatory damages for tortious conduct committed with malice or gross negligence, but neither the House of Delegates nor the Senate proposed changing the language quoted above regarding the scope of the limitation on liability. After the proposed LGTCA passed the Senate in 1986 with the cap amounts raised to $200,000 per person and $500,000 per occurrence, it failed to pass the House. The proposed Act was introduced again in 1987 as the companion bills House Bill 253 and Senate Bill 237. Senate Bill 237 was eventually enacted as Chapter 594.

The 1986 and 1987 bill files maintained by the Department of Legislative Services reveal that the proponents and the opponents of the LGTCA believed that the above-quoted disjunctive language, in the proposed LGTCA as originally introduced, meant that the monetary cap would apply to tort actions directly against local governments and to tort actions against local government employees. If the critical language had remained in the same form as the bills were introduced,

---

9. It should be noted that, from the outset, even the LGTCA's strongest proponents conceded that there would be at least one unavoidable restriction on the scope of the Act's limitation on liability. The County Attorneys Strategy Workgroup which drafted the original proposed bill in 1985 stated that the "limits and provisions of the Act would ... not be applicable to actions brought pursuant to federal statutes, e.g., 42 U.S.C.1983." *Report of the Governor's Task Force to Study Liability Insurance*, at 58, Appendix C–4 (December 1985).

the legislative history reflected in the Report of the Task Force and in the bill files would support the Authority's argument in the present case.

During the 1987 legislative session, both the House Judiciary Committee and the Senate Judicial Proceedings Committee had problems with the liability and monetary cap provisions of the two bills which proposed the LGTCA. The House Judiciary Committee proposed 11 amendments to H.B. 253, *inter alia*, to increase the cap to $250,000 per individual claim and $750,000 per occurrence, to state explicitly that employees were liable for punitive damages, and to make employees liable for compensatory damages in excess of the cap amounts for tortious conduct committed with malice or gross negligence. The House Judiciary Committee did not, however, change the disjunctive language regarding the monetary caps, although it added a phrase as follows (additional language in italics): "liability of a local government ... for: (1) damages resulting from tortious acts or omissions *of the local government;* or (2) liability arising under" the subsection pertaining to judgments rendered against employees. On the House floor, H.B. 253 was further amended to clarify that the LGTCA would obligate local governments to provide a legal defense to employees in tort actions for conduct committed in the scope of employment.

Meanwhile, the Senate Judicial Proceedings Committee proposed several amendments to Senate Bill 237. One of them increased the monetary caps, although not to the same extent that the House had. Most significantly, the Senate Judicial Proceedings Committee rejected the disjunctive language which had been intended by the sponsors to make the monetary cap apply to actions against local governments or to actions against employees. Instead, the Senate Committee adopted the language which now appears in § 5–303(a).

After passing the House, H.B. 253 was referred to the Senate Judicial Proceedings Committee. It received a favorable report from the Senate Judicial Proceedings Committee but only after the Senate Committee had altered H.B. 253 so

that it conformed to S.B. 237. In particular, the Senate committee replaced the House's language regarding the scope of the damages cap provision with the significantly different language in S.B. 237: "liability of a local government . . . for damages resulting from tortious acts or omissions, including liability under" the subsection pertaining to judgments rendered against employees. By doing this, the Senate Committee struck out the phrase "of the local government" which the House had inserted after "tortious acts or omissions" and struck out the word "or."

On the same day that the Senate Judicial Proceedings Committee voted favorably on the House bill as amended to conform with S.B. 237, the Senate as a whole passed S.B. 237 unanimously. The next day the Senate also voted unanimously in favor of the House bill as amended to conform with S.B. 237.

As neither house concurred in the other's proposed amendments to H.B. 253 or S.B. 237, a Conference Committee was convened to resolve the differences. The Conference Committee reached a compromise on the cap amounts, of $200,000 per individual claim and $500,000 per occurrence, and adopted the House floor amendment clarifying that local governments are responsible for providing a legal defense for employees. The Conference Committee, however, declined to adopt the House's language regarding the scope of the damages cap provision and adopted the Senate's version. The Senate then unanimously adopted the Conference Committee's version of S.B. 237, and the House passed the Conference Committee's version by a vote of 97 to 10.

Consequently, the Senate Judicial Proceedings Committee, and ultimately both the Senate and the House, rejected the proposed language which the earlier proponents of the LGTCA believed would make the monetary caps applicable to virtually all actions against local governments "or" actions against local government employees. There is no legislative history suggesting that the new language adopted by the Senate Judicial Proceedings Committee, which became § 5–

303, was intended to make the monetary caps applicable to suits directly against local governments. Moreover, it seems clear that both houses viewed the difference in wording as a matter of substance, as neither house was willing to acquiesce in the other house's version, thereby requiring a conference committee to resolve the differences.

Both the Court of Special Appeals and the Circuit Court for Baltimore City correctly held that the LGTCA's caps on damages were inapplicable to a tort judgment against the Authority.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.*