Dear Honorable Gail H. Bates
You have asked for our opinion how the State law that prohibits self-referral by health care practitioners applies to an orthopedic practice group (or other non-radiology medical practice group) that owns a magnetic resonance imaging ("MRI") machine or computerized tomography ("CT") scanner. Specifically, you ask:
 1. Would it violate that law for a physician in that group to refer patients for tests on the machines owned by the practice?
 2. Would the answer to the first question be different if all of the readings were performed by a radiologist employee or member of the group practice, or if the readings were contracted out to a radiology practice group?
In our opinion, the law bars a physician in the orthopedic practice from referring patients for tests on an MRI machine or CT scanner owned by that practice, regardless of whether the services are performed by a radiologist employee or member of the practice or by an independent radiology group. The same analysis holds true for any other non-radiology medical practice that owns an MRI machine or CT scanner.
 I Patient Referral Law
The State law prohibiting self-referrals by health care practitioners was enacted in 1993. Chapter 376, Laws of Maryland 1993, codified at Annotated Code of Maryland, Health Occupations Article, § 1-301 et seq.[1] It generally prohibits referrals when the referring health care practitioner stands to benefit financially from the referral. Specifically, a health care practitioner may not refer a patient to a health care entity in which the health care practitioner has a beneficial interest, in which the practitioner's immediate family owns a beneficial interest of at least 3 percent, or with which the practitioner or the practitioner's immediate family has a compensation arrangement. § 1-302(a).[2]
There are a number of exceptions to the general prohibition against self-referral. § 1-302(d). Even when a referral is permitted, in many circumstances, the practitioner must disclose to the patient any beneficial interest that the practitioner or the practitioner's family has in the transaction. § 1-303.
One of the exceptions to the self-referral prohibition concerns "in — office ancillary services." The statute provides that the prohibition does not pertain to:
 (4) A health care practitioner who refers in — office ancillary services or tests that are:
(i) Personally furnished by:
1. The referring health care practitioner;
 2. A health care practitioner in the same group practice as the referring health care practitioner; or
 3. An individual who is employed and personally supervised by the qualified referring health care practitioner or a health care practitioner in the same group practice as the referring health care practitioner;
 (ii) Provided in the same building where the referring health care practitioner or a health care practitioner in the same group practice as the referring health care practitioner furnishes services; and
(iii) Billed by:
 1. The health care practitioner performing or supervising the services or;
 2. A group practice of which the health care practitioner performing or supervising the services is a member.
§ 1-302(d)(4).
The law provides several remedies to discourage prohibited referrals. Neither a health care entity nor a referring practitioner may present a bill for payment to an individual, third party payor, or other person for health care services provided as a result of a prohibited referral.
§ 1-302(b). A practitioner who submits a bill in violation of § 1-302(b) is liable to the payor for any amounts collected, and may not submit a bill to the person who received the health care services. § 1-305. A practitioner who makes a prohibited referral or who bills for services provided as a result of a prohibited referral is also subject to disciplinary action by the appropriate regulatory board. § 1-306.
A federal self-referral statute similarly prevents physicians from making referrals to entities with which they or their immediate families have financial relationships. See 83 Opinions of the Attorney General 142, 161-70 (1998) (discussing 42 U.S.C. § 1395nn). We have previously described the rationale for laws against self-referral: "Opponents of self — referral fear that it leads to unnecessary tests, creates a conflict between the patient's interests and the physician's own, and could adversely affect the health care market by squeezing out other facilities and wasting health care dollars." Id. at 162; see also 79 Opinions of the Attorney General 285, 287-88 (1994) (describing concerns that led to enactment of Maryland statute).
 II Analysis
You have asked about the application of the self-referral law in the context of an orthopedic practice that owns an MRI machine or CT scanner and refers its own patients for tests on those machines.
 A. Application to In-Office Referrals
The initial question is whether the scenario you describe involves a "referral" for purposes of the statute. Section 1-301(l) defines "referral" as "any referral of a patient for health care services," and states that the term "includes":
 (i) The forwarding of a patient by one health care practitioner to another health care practitioner or to a health care entity outside the health care practitioner's office or group practice; or
 (ii) The request or establishment by a health care practitioner of a plan of care for the provision of health care services outside the health care practitioner's office or group practice.
These two provisions appear to describe circumstances in which a patient is sent to another practitioner or entity outside the office or practice of the referring practitioner. It might be argued that the statute governs only out — of-office referrals and does not apply when a patient is sent for a test on a machine owned by the practice itself. The merits of this argument depend on whether the use of the verb "include" in the definition of referral was intended to be limiting or illustrative.
Unless the context requires otherwise, the term "including" in the Health Occupations Article means "by way of illustration and not by way of limitation." § 1-101(f); see also Annotated Code of Maryland, Article 1, § 30; State v. Wiegmann, 350 Md. 585, 593, 714 A.2d 841
(1998),
Black's Law Dictionary 763 (6th ed. 1990). However, the Court of Appeals has recognized that the term can be ambiguous and that its meaning must be determined in light of its context. Housing Authority v. Bennett, 359 Md. 356, 371-72, 754 A.2d 367 (2000); Pacific Indem. Co. v. Interstate Fire Cas. Co., 302 Md. 383, 396, 488 A.2d 486 (1985).
"Context" includes the remaining provisions of the statute, as well as the legislative history. Kaczorowski v. City of Baltimore, 309 Md. 505,514 — 15, 525 A.2d 628 (1987). See also 2A Norman J. Singer, Sutherland Statutory Construction § 47.07 (6th ed. rev. 2000) (term "includes" usually a term of enlargement).
In this case, other provisions of the statute make clear that the term "referral" was intended to encompass in-office referrals. For example, one of the statutory exceptions to the prohibition against self-referral concerns a practitioner who "refers" a patient to another practitioner in the same group practice. § 1-302(d)(2). Similarly, another exception provides that the prohibition on self-referral does not apply to in-office ancillary services or tests that are personally furnished by the referring practitioner, a practitioner in the same group practice as the referring practitioner, or an individual who is employed and personally supervised by the referring practitioner or a practitioner in the same group practice as the referring practitioner, where those services are provided in the same building where the referring practitioner or a practitioner in the same practice provides services, and billed by the practitioner or the group practice of which the practitioner performing or supervising the service is a member. § 1 — 302(d)(4). Neither of these provisions would be necessary if the law applied only to referrals outside the practitioner's office. In construing the federal self-referral statute, the Department of Health and Human Services reached a similar conclusion concerning whether an in-office referral is encompassed by that statute. 63 Fed. Reg. 1659, 1685 (January 9, 1998) ("In addition, the in-office ancillary services exception [to the federal prohibition] would not be necessary if in-office referrals were free from the prohibition").
In our opinion, the two specific referral scenarios described in § 1 — 301(l)(2)(i) and (ii) were intended to be illustrative and the verb "includes" in the definition of "referral" must be read as a term of enlargement rather than limitation. Thus, the statute encompasses in — office as well as out-of-office referrals.
 B. In-Office Ancillary Services Exception 1. Statutory Provisions
As noted above, there is an exception to the self-referral prohibition for "in-office ancillary services." § 1-302(d)(4). At first blush, this exception would appear to permit referrals involving an MRI machine or CT scanner owned by an orthopedic practice. However, the statutory definition of "in-office ancillary services" expressly excludes such services. Section 1-301(k)(2) provides:
 Except for a radiologist group practice or an office consisting solely of one or more radiologists, "in-office ancillary services" does not include:
(i) Magnetic resonance imaging services;
(ii) Radiation therapy services; or
(iii) Computer tomography scan services.
This language reflects a legislative intent to prohibit referrals for in-office MRI tests or CT scans, unless the equipment is owned by a practice made up entirely of radiologists.
 2. Legislative History
The legislative history supports this conclusion. House Bill 1280 (1993), which was enacted as Chapter 376, was assigned to the Environmental Matters Committee in the House. Materials in the Committee file indicate that the Committee heard testimony and received communications focusing expressly on the language in § 1-301(k)(2)[3] related to MRI tests and CT scans, and objecting to the effect that legislation would have on existing practices. The Orthopaedic and Sports Medicine Center wrote to oppose the bill, stating that it employed x-ray technicians to perform x-rays in the office as a service to patients whose injuries impeded their mobility. Similar testimony was offered by the Neurology Center (a group practice of neurologists and radiologists),[4] and by a radiologist in a group practice with other physicians.[5]
The Committee responded by proposing an amendment narrowly drawn to exempt the Neurology Center.[6] This amendment was adopted by the House, but the amendment was subsequently removed by the Senate a change that was ultimately adopted by the conference committee.[7]
The debate on the floor of the Senate makes the legislative intention quite clear. The situation of group practices that owned MRI machines and CT scanners, and that included neurologists and other physicians in addition to radiologists, occupied much of the discussion. During the debate on third reader in the Senate, Senator Hollinger, the floor leader on the bill, explained that three pieces of major medical equipment had been excluded from the definition of in-office ancillary services because:
 All of the studies that have been done have shown that those three pieces of major medical equipment are where the most abuses have taken place. Now, because of that the legislation says that the only people that can really own that in a group practice is a sole radiology practice, because those are the people that do those tests. Audio tape of Senate floor debate concerning House Bill 1280 (1993) (third reading).
This concept appears throughout the Senate debates on this bill. Earlier, Senator Hollinger had explained:
 The reason that it says the way that it says in the bill, is if you are in the practice of radiology, that in order to practice radiology, you have to have equipment, okay. But if you are not in that practice, if that isn't your specialty, and you own those pieces of equipment, you are then making a referral. Okay.
Audio tape of Senate floor debate concerning House Bill 1280 (1993) (explanation of committee report). And also:
 It may be overutilization, because the cost has to be fade and there's only three pieces of equipment that we deal with like that. One is an MRI, the other radiation therapy services, and computer tomography scans. Because they are very, very expensive pieces of equipment and the more expensive the equipment is the more people you've got to refer to it to pay for it.
Id. Senator Hollinger also asserted that practices like the Neurology Center would not necessarily have to close:
 That's not so either, because this particular practice is made up, correct me if I'm wrong, of neurologists and radiologists, and equipment. . . . Now if the radiologists in the same location in the same building, had their own corporation, that owned that equipment, and the neurologists were referring the same way that they are now, without the investment in it, they could continue operating like that.
Audio tape of Senate floor debate concerning House Bill 1280 (1993) (second reading). In light of this history, and the clear language of § 1 — 302(k)(2), it is our view that an orthopedic physician or practice that owns an MRI machine or a CT scanner and refers patients for those services would be making a referral covered by the self-referral law.
Moreover, the referral would not fall within the in-office ancillary services exception, whether the services were performed by a member or employee of the group practice or were contracted to a radiology practice.
 III Conclusion
In our opinion, State law bars a physician in an orthopedic group practice from referring patients for tests on an MRI machine or CT scanner owned by that practice, regardless of whether the services are performed by a radiologist employee or member of the practice or by an independent radiology group. The same analysis holds true for any other non-radiology medical practice.
 J. Joseph Curran, Jr. Attorney General
 Kathryn M. Rowe Assistant Attorney General
 Robert N. McDonald Chief Counsel Opinions Advice
[1] All statutory citations in this opinion are to the Health Occupations Article, unless otherwise indicated.
[2] The coverage of the law is extremely broad. The phrase "health care practitioner" is defined to include any person who is licensed, certified, or otherwise authorized to provide health care services under the Health Occupations Article. § 1-301(g). The phrase "health care entity" means a business entity that provides health care services for testing, diagnosis, or treatment purposes or dispenses drugs, medical devices, or medical appliances. § 1-301(h).
[3] The provision was designated § 1-301(j)(2) in the initial draft of the bill.
[4] Testimony of Howard Silby, M.D.
[5] Testimony of Bruce J. Bowen, M.D.
[6] As passed by the House, an uncodified Section 4 of the bill would have provided that the referral prohibition did not apply to "A neurology group practice that contains three or more radiologists who are partners in a group practice with neurologists which was in existence on or before December 30, 1988 provided the neurology group practice does not expand its facilities beyond the number of locations in existence in the State on January 1, 1993."
[7] The Senate Committee amendments also called for a study to be completed by December 31, 1995 on the effects of self-referral, and grandfathered practitioners with existing beneficial interests and compensation arrangements with health care entities until March 15, 1997.
The study was completed in March 1996. See Lippincott, The Incidence of Physician Self-Referral in Maryland: Final Report. However, no changes were made in the law in response to the study, and the grandfather clause has now expired. *Page 18