988 A.2d 20

**PRINCE GEORGE'S COUNTY, MARYLAND, et al.**

v.

**Keith LONGTIN.**

**No. 1818, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Jan. 27, 2010.

**100**

Rajesh A. Kumar (Jay H. Creech, Stephanie P. Anderson, County Atty., on the brief), Upper Marlboro, for appellant.

Cary J. Hansel (Timothy F. Maloney, Steven B. Vinick, Joseph M. Creed, Joseph, Greenwald & Laake, PA on the brief), Greenbelt, for appellee.

Panel: HOLLANDER, ZARNOCH and RAYMOND G. THIEME, JR., (Retired, Specially Assigned) JJ.

ZARNOCH, J.

We are asked in this appeal to determine whether Maryland's expansive damage remedy for State constitutional violations is subject to key strictures of the statutorily-created Local Government Tort Claims Act (LGTCA), Md.Code (1973, 2006 Repl.Vol.), Courts and Judicial Proceedings Article (C & JP) §§ 5–301 *et seq.* This question arises in the context of allegations by appellee and cross-appellant Keith Longtin of a pattern and practice of police misconduct and wrongful incarceration sanctioned by Prince George's County, appellant/cross appellee.[1]

On October 7, 1999, Longtin was charged with first-degree murder in the death of his wife, Donna Zinetti, who three days earlier was raped and murdered while jogging near her home.[2] Longtin was then incarcerated in the Prince George's County Detention Center. Eight months later, Longtin was released. Another man, Antonio Oesby, was charged with the crime.[3]

On October 31, 2000, Longtin's lawyer sent to then-Prince George's County Executive Wayne Curry a notice of claim that stated:

> Pursuant to Md.Code Ann. Cts. & Jud. Proc. § 5–304, Mr. Longtin hereby gives notice that he suffered injuries to his person and his property and was denied important rights guaranteed to him under the United States Constitution when he was arrested on October 5, 1999 by the Prince George['s] County Police Department, and thereafter incar-

---

1. The other appellants/cross appellees are police detectives Ronald Herndon, Troy Hardy, Bert Frankenfield and Glen Clark. For ease of reference, we will refer to these parties simply as "appellants."

2. Appellee was formally indicted on December 1, 1999.

3. Although the parties state that Longtin was released from custody on June 12, 1999, the docket entries disclose that appellant was freed on June 13, 2000, after a circuit judge set his bond at personal recognizance. It was not until November 16, 2000, that his criminal case was *nol prossed.* On June 21, 2001, Oesby, a serial rapist, was convicted of Zinetti's murder.

cerated in Prince George[']s County for a period of months for a murder he clearly did not commit.

The claim was apparently forwarded to the County's Office of Law, which received it on November 6, 2000.

Nearly a year later, on October 22, 2001, Longtin filed suit in the Circuit Court for Prince George's County. In his 13–count complaint, he named as defendants, Prince George's County, it's then-Chief of Police, John Farrell, and 5 members of the Criminal Investigation Division (CID) of the County Police Department: Troy Harding, Ronald Herndon, Bert Frankenfield, Glen Clark and Michael McQuillan. Longtin alleged that the defendants' actions violated two provisions of the Maryland Declaration of Rights (Articles 21 and 24)[4] constituted false imprisonment, false arrest and malicious prosecution, intentionally inflicted emotional distress, invaded his privacy and portrayed him in a false light, intentionally misrepresented material facts, amounted to negligence, and resulted in negligent detention. The complaint also asserted, among other things, that the individual defendants had engaged in a pattern or practice of "unconstitutional and unlawful detention and interrogation" and "excessive force and brutality," which the County had tolerated, encouraged and instigated by allegedly failing to "properly train, prosecute, supervise and discipline its officers." Longtin also sought injunctive relief prohibiting improper interrogations and imposing certain procedural safeguards on those interrogations. In addition, he alleged a civil conspiracy by which the defendants "agreed and jointly acted in ... unconstitutional and unlawful conduct." Finally, Longtin sought a declaratory judgment "that the detaining and interrogation of the plaintiff as well as the on-going pattern and practice of detaining individuals and conducting interrogations in the manner de-

---

**4.** Article 21 provides that "in all criminal prosecutions, every man hath a right ... to be allowed counsel...." Article 24 states:

That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

tailed herein violate[d] Maryland Rule 4–212 and the Maryland Declaration of Rights."

An allegation generally repeated in many of the counts stated:

> As a direct result of [Defendants'] deprivations, Plaintiff was subjected to excessive interrogation totaling 38 hours, deprived of sleep and privacy, harassed, humiliated, and subjected to undue infliction of emotional distress. The CID Defendants attempt[ed] to coerce Longtin to make a false confession, and thereafter falsified a confession, resulting in Longtin's incarceration for eight months, while Defendants ignored and/or neglected the exculpatory evidence in their possession.

In 12 of the 13 counts, the complaint sought $10 million in compensatory damages and $50 million in punitive damages.

The County and the individual defendants filed separate, boilerplate answers. However, the County's answer specifically noted that "[p]laintiff's claim is barred by the required notice provisions" and the individuals' consolidated answer stated that the "claims are barred by the provisions of section 5–304 of the Courts and Judicial Proceedings [A]rticle...." The defendants sought to raise the notice of claim issue in various motions, including motions for summary judgment, but their contentions were ultimately rejected by the circuit court.[5]

After some claims fell out, including some counts against the County, and the Chief of Police and Detective McQuillan were dropped as parties, the trial began in August of 2006. The case was submitted to the jury on eight counts.[6] On August 31, 2006, the jury returned a verdict in Longtin's favor on all

---

5. At a January 24, 2003 hearing, Judge Lamasney said:

 I'm going to deny the motion on the basis of untimely notice. I think the facts in this case are sufficient. I don't find any prejudice to the county and I am going to deny the motion on that basis.

6. According to docket entries, the defense moved for judgment at the conclusion of Longtin's case and again at the conclusion of the entire case. Both motions were denied.

eight counts.[7] It then awarded $5.2 million in compensatory damages against the County.[8] In addition, Hardy, Frankenfield and Clark were each assessed $275,000 in punitive damages and Herndon was assessed $350,000.

On September 11, 2006, the County and the officers filed a Motion for Judgment Notwithstanding the Verdict and/or for New Trial and/or to Exercise Revisory Power. They argued that 1) there was no authority for Longtin's "pattern and practice" claim; 2) the jury instruction on his due process claim under Article 24 was insufficient; 3) the $200,000 property damage award should have been reduced to reflect the evidence at trial; and 4) the damage awards should be limited by the caps in the LGTCA, C & JP § 5–303 and in C & JP § 11–108 (limitations on non-economic damages). Longtin opposed the motion, asserting, among other things, that even if the defense's first two arguments were correct, the errors were harmless and that § 11–108's damage cap did not apply to intentional torts such as those involved here. In addition, he asserted:

The Local Government Tort Claims Act ("LGTCA") does not cap the damages here because, at the time of the facts

---

7. The verdict sheet consisted of special interrogatories on each defendant's liability, an entry for a general verdict for compensatory damages, and entries with respect to each defendant's liability for punitive damages. According to this verdict sheet, Prince George's County was found liable for two constitutional violations: the Article 24 count and the pattern and practice claim. Each of the remaining individual defendants was also found liable for two constitutional violations (Article 24 and civil conspiracy), as well as false imprisonment, intentional infliction of emotional distress, and privacy invasion/false light. Detective Herndon was also found liable for false arrest and malicious prosecution. With respect to the common law torts, the jury specifically found that each individual defendant "acted with malice." In addition, the jury found that each officer acted "intentionally" in violation of Longtin's constitutional rights and in inflicting emotional distress.

8. Of this amount, $5 million was designated as non-economic damages and $200,000 was labeled property damages. The sum was awarded solely against the County pursuant to CJ & P, § 5–303(b)(1) which provides with certain exceptions "a local government shall be liable for any judgment against its employees for damages...."

giving rise to this case, the cap did not apply to constitutional claims. *See Housing Auth. v. Bennett,* 359 Md. 356, 754 A.2d 367 (2000).

A hearing was held on the motions, where argument was confined to those issues specified in the written motion. Subsequently, in an order dated August 31, 2007, the circuit court denied the motions for judgment notwithstanding verdict and for new trial, but with respect to the motion to revise, the court granted it in part and denied in part. Specifically, the court reduced the property damage award to $25,000, reduced Herndon's punitive damages to $50,000 and, "[u]pon reconsideration" of appellants' motion for judgment at trial, vacated the punitive damage awards assessed against the remaining defendants because of insufficient evidence of actual malice. Relying on Longtin's arguments, the court rejected the contention that the statutory caps applied in this case.[9] The County and the officers noted their appeal and Longtin cross-appealed on the punitive damages ruling.

## QUESTIONS PRESENTED

In this appeal, appellants have raised the following issues:
1. Whether the trial court erred in denying Appellants' Motion for Summary Judgment on 12 of 13 Counts in Appellee's Complaint for failure to comply with the notice provisions of the LGTCA, and/or not applying the Act's limitation on damages.
2. Whether the trial court erred in allowing Appellee to advance a *"Monell [v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ] type" theory of liability against a municipality based on a "pattern and practice" violation under the Maryland Constitution, when

---

9. The court made no mention of Longtin's claims for declaratory and injunctive relief. In light of the substantial relief obtained by Longtin and the passage of time, we believe these claims either have been abandoned or rendered moot or their present adjudication would serve no useful purpose. *See Hamilton v. McAuliffe,* 277 Md. 336, 340, 353 A.2d 634 (1976) (Declaratory judgment may not be granted when it would not serve a useful purpose.)

no such claim has been previously recognized in Maryland and, if adopted, there was insufficient evidence for such a finding.

3. Whether the trial court erred during its evidentiary rulings allowing testimony of DNA testing along with the crimes and conviction of another individual after the determination of probable cause; permitting testimony of other interviews or interrogations; and limiting hearsay to establish probable cause for an arrest and detention.

4. Whether the trial court erroneously instructed the jury regarding the law as it relates to claims for a due process claim; pattern and practice; that probable cause is to be judged at the time of arrest; intentional infliction of emotional distress; the authority to terminate a prosecution; and the definition of malice for punitive damages.

On cross-appeal, appellee raises this question:

Did the trial court improperly reduce the punitive damages in this matter *sua sponte* without first providing notice or an opportunity to be heard to the parties?

For reasons set forth below, we affirm the jury verdict as modified by the circuit court.

## FACTS

On October 5, 1999, Longtin called the Prince George's County Police to report that his estranged wife was missing. At that time, the police had already discovered Zinetti's body and CID considered her husband a suspect.

A note from Detective Harding to Detective Herndon expressed police reaction to the call:

RON: Your V's husband called Dist. VI for check on the welfare. Det. Lloyd played along and took m/p info.

He made statement to her about the V being sexually assaulted at knifepoint in the past.

He is working somewhere in DC tomorrow. He agreed to meet Lloyd at 1500 hrs. at Dist. VI in order to "sign the m/p report."

Good luck:

Get him!

Troy [10]

Later on October 5, 1999, Longtin, after learning of a media report of a woman's body found near Zinetti's apartment, arrived at the yellow-taped crime scene. He asked a police officer about his wife and the officer, after calling in to his supervisor and being informed of Longtin's identity, told appellee to get into his police cruiser.[11] He was then taken into an interrogation room in Landover.

Over the next day and a half, Longtin was questioned on a rotating basis by at least six different officers.[12] Police records showed that he slept only 50 minutes during that 38–hour period.[13] At 8:55 p.m. on October 5th, Longtin signed an "Advice of Rights and Waiver Form" indicating, among other things, that he had a right to talk to a lawyer and that he was willing to make a statement "at this time" without a lawyer. When asked at trial why he signed this document, Longtin said he had been told by officers "If I had nothing to hide or worry about, I would sign those rights, so I said 'Well, I have nothing to hide,' so I signed them." Although all of the detectives testified at trial that Longtin did not ask for a lawyer, Longtin testified that during the questioning he told officers that he wanted to talk to a lawyer and his cell phone records showed that he tried to call two different lawyers from

---

10. At trial, Detective Harding testified that by this "Get him" exclamation, "I'm just trying to encourage him to do a good job in the case."

11. Testimony at trial conflicted over whether Longtin was forced to accompany the officer and whether he was permitted to secure his car before leaving.

12. Appellant contended that there were at least seven officers involved in the interrogation. Early in the interrogation, one of the officers took down his statement, but Longtin refused to sign it.

13. Longtin testified at trial that he did not sleep during the entire 38 hours. Although provided with some food, Longtin testified it was not sufficient and, in one instance, the food was putrid. He also claimed that he had been hallucinating.

the interrogation room. Appellants claimed that Longtin was not under arrest or in custody until the conclusion of the interrogation and thus, he did not have to receive warnings pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the clock did not begin ticking on the 24-hour deadline of Md. Rule 4–212 for presenting him to a district court commissioner. However, the officers took his belt, wallet, shoelaces and cell phone and, according to Longtin, threatened him with violence when he indicated he wanted to leave, and, at one point, handcuffed him to the wall. Appellant was asked "what if" questions about the murder, such as: "[W]hat if you had done this murder? [W]hat do you think would have happened?" He was shown photographs of his dead wife.[11]

According to the notes of Sgt. Clark, Longtin admitted to having a verbal and physical altercation with his wife on October 3, 1999, 14 hours before her body was found. Clashing over her alleged extra-marital affair, he said he pushed her down. He stated that then he went into the kitchen, got a knife and ran after her when she left to go jogging, "but I didn't kill her." [15]

On October 7, 1999, Longtin was formally arrested, taken before a commissioner, and charged with murdering Donna Zinetti, an action appellant later contended violated Md. Rule 4–212(f)(1).[16] A Statement of Probable Cause completed by

---

**14.** At one point in the questioning, an officer brought a Bible into the interrogation room, and pointed out to Longtin a passage in Galations about confessing to one another. When asked how he felt about the incident, appellant testified: "I felt that it was because they knew I was [C]hristian and that I went to church, and they were trying to use this against me to break me down."

**15.** Earlier that day, Longtin had an altercation with one of the deacons at his wife's church over a remark the deacon made to her.

**16.** This rule provides that when a defendant is arrested without a warrant, "[t]he defendant shall be taken before a judicial officer of the District Court without unnecessary delay and in no case later than 24 hours after arrest...." Longtin contended he was "arrested" long before October 7th. At the time, he was presented to the commission-

Detective Herndon said that Longtin "volunteered" to come in and talk to police about his wife's death. The Statement recited:

> While interviewing the Def[endant,] he was developed as a suspect. At that point the Def[endant] was advised [of] his constitutional rights and subsequently admitted to be[ing] involved in this case. The defendant admitted to having a verbal and physical altercation at the victim's apartment. The defendant gave details about this case that had not been related to the media and only the perpetrator would have known. He stated that during the altercation the victim ran out of her apartment and that he ran after her with a knife. The defendant knew that the victim had been stabbed several times and that the stabbing occurred in the wooded area near the victim's apartment.

At trial, Longtin asserted that the Statement of Probable Cause was false, *viz.* that he never admitted his involvement in the case and that details of the murder were given to him by the police or were publicly available and thus were not known "only [by] the perpetrator." He also emphasized that this charging document deliberately omitted appellant's repeated declaration in interrogation: "[B]ut I didn't kill her." [17] Longtin's attorney in the criminal case, Samuel Serio, conferred with the State's Attorney Office and was told that appellant faced a "double life" sentence in connection with the charges.

The police took DNA samples from Longtin to compare with those left by the perpetrator of the crime. On January 14, 2000, Meredith Monroe of the Maryland Police Crime Laboratory spoke to Detective Herndon and told him that

---

er, the Court of Appeals had not decided *Williams v. State,* 375 Md. 404, 825 A.2d 1078 (2003), *Facon v. State,* 375 Md. 435, 825 A.2d 1096 (2003), and *Hiligh v. State,* 375 Md. 456, 825 A.2d 1108 (2003). In this trilogy of cases, the Court clarified the relationship between Rule 4–212 and the voluntariness of a confession obtained before presentment.

17. Longtin also claimed that Detective Herndon gave false testimony at a probable cause hearing, and that Detective Clark gave misleading testimony at a suppression hearing about the appellant's involvement in the murder. *See infra* n. 21.

Longtin had been excluded as a possible donor of the DNA taken from the victim. This exculpatory information was not shared with the State's Attorney or Longtin's counsel. No steps were taken to release appellee. Detective Herndon also told Monroe that he would provide her with DNA from Oesby, but waited two more months before requesting testing.[18]

On June 12, 2000, Detective Herndon advised the State's Attorney's Office that the DNA found on Zinetti matched Oesby, and Longtin was released. During his incarceration, Longtin lost three automobiles. He was evicted from his apartment and his possessions were left on the curb. In the detention center, he was attacked by an inmate, and placed in a mass bunk in the middle of the floor with female guards watching him use the restroom. He was not permitted to attend his wife's funeral. As the trial judge noted when ruling on appellants' post-trial motions, Longtin left County custody "with little more than the clothes on his back."

Longtin sought to establish his "pattern and practice" claim against the County in a variety of ways. He set forth evidence through Detective Herndon that sleep deprivation was a "tool" of investigation that he had been trained to use.[19] Admitted into evidence was an interview and interrogation training manual of the Prince George's County Community Police Institute that told officers they could read a suspect his rights "or wait until after he admits." The manual stated that the interrogator should consider handcuffing an angry suspect to the wall "and let [him] sit a while." Officers were advised to

---

18. Evidence at trial indicated that Detectives Clark and Herndon were aware of an attempted rape of one of Zinetti's neighbors and that a male suspect had been looking into windows in the victim's neighborhood.

19. At trial the following colloquy occurred between plaintiff's counsel and Detective Herndon:

Q. And you've testified that you're aware, are you not, Detective, that, quote, when you're tired, sometimes you may want to answer things just to answer them so you can get to sleep. Do you recall that testimony?
A. Correct.

"wait out" a passive suspect because "few people can keep it up." If a suspect "is so convincing that you are starting to believe him . . . [l]eave the room [and] [d]on't go back unless you re-fortify your conviction that he is guilty." Detective Kerry Jerningan testified that it was departmental policy that police did not necessarily have to take the suspect before a district court commissioner within 24 hours if the suspect was continuously providing information, and confirmed that a police training manual described Md. Rule 4–212(f)(1) as "[a] Maryland procedural rule, not law" that could be waived.

There was testimony regarding other "lengthy interrogations," one lasting 72 hours, and the interrogation, confession and confinement of a developmentally-disabled minor who was released when another person was convicted of the offense. One of appellee's experts, William Katsaris, a police consultant and trainer, opined that in Longtin's case, one or more of the officers violated commonly accepted police practices by using sleep deprivation,[20] denying the suspect a lawyer, physically threatening him, "shoving into his face" pictures of his dead wife, violating the 24–hour presentment rule, and asserting that probable cause existed to charge Longtin in the absence of physical evidence and in the face of his declaration of innocence. He also found fault in the failure to release Longtin after the DNA results were in, noting that when you find out you have an innocent man in jail, you have to get in your car and go get him out.

Appellants' expert, William Wagner, a police training consultant, sharply disagreed with Katsaris, crediting the police log over Longtin's testimony. The expert concluded that the police had acted properly. He said that probable cause existed to arrest Longtin and that when he was interrogated, he was never in custody (even though escorted to the bathroom by two officers and stripped of his belt, wallet and cell phone)

---

**20.** Appellants' expert on sleep and fatigue opined that Longtin had not suffered from extreme sleep deprivation and that he could not have hallucinated from sleep deprivation.

and was free to leave or consult his attorney.[21] The jury found otherwise.

## DISCUSSION

### 1. State Constitutional Torts and LGTCA Requirements—An Uneasy Fit.

The appellants argue that all but one of Longtin's successful claims are barred by the notice requirements of the LGTCA.[22] Appellants also contend that the approximately $5 million compensatory damage award cannot stand because it exceeds the monetary caps of the LGTCA.[23] The parties have battled

---

21. Longtin's counsel asked Wagner about Detective Herndon's omission in testifying at the probable cause hearing of the suspect's insistent line, "[B]ut I didn't kill her," particularly the detective's response of "No, he did not" to the question of whether Longtin had said "anything further":
 Q. Is, "No, he did not" fair, objective and ethical?
 A. In that testimony, it's not accurate.
 Q. You would agree that that's a violation of a commonly acceptable Police Practice?
 A. I would agree it's a misrepresentation. Whether it was a mistake, whether it was a lack of his memory, I can't answer that. But the answer is not accurate.

22. C & JP § 5–304(b) provides:
 (1) Except as provided in subsections (a) and (d) of this section, an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 180 days after the injury.
 (2) The notice shall be in writing and shall state the time, place, and cause of the injury.
 However subsection (d) states:
 Notwithstanding the other provisions of this section, unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given.
 Appellants concede that Longtin gave timely notice of his malicious prosecution claim, but argue that notice of the remaining claims was sent 212 days after the 180–day deadline.

23. C & JP § 5–303 provides in relevant part:
 (a)(1) Subject to paragraph (2) of this subsection, the liability of a local government may not exceed $ 200,000 per an individual claim, and $ 500,000 per total claims that arise from the same occurrence

over these defenses on many fronts. On the notice of claim issue, Longtin responds that: 1) the denial of appellants' summary judgment motion on this question was not reviewable on appeal after the case was tried by the jury; 2) because notice was timely on the malicious prosecution claim and Detective Herndon was found liable for this tort, under the "general verdict rule" the jury was assumed to award under this count, and the County was thereafter fully liable for the entire amount of the compensatory damage award, regardless of whether the remaining claims were in compliance with notice requirements; 3) he substantially complied with the

for damages resulting from tortious acts or omissions, or liability arising under subsection (b) of this section and indemnification under subsection (c) of this section.

(2) The limits on liability provided under paragraph (1) of this subsection do not include interest accrued on a judgment.

(b) (1) Except as provided in subsection (c) of this section, a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.

(2) A local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection.

(c) (1) A local government may not be liable for punitive damages.

(2) (i) Subject to subsection (a) of this section and except as provided in subparagraph (ii) of this paragraph, a local government may indemnify an employee for a judgment for punitive damages entered against the employee.

(ii) A local government may not indemnify a law enforcement officer for a judgment for punitive damages if the law enforcement officer has been found guilty under § 3–108 of the Public Safety Article as a result of the act or omission giving rise to the judgment, if the act or omission would constitute a felony under the laws of this State.

(3) A local government may not enter into an agreement that requires indemnification for an act or omission of an employee that may result in liability for punitive damages.

(d) Notwithstanding the provisions of subsection (b) of this section, this subtitle does not waive any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by an employee of a local government.

(e) A local government may assert on its own behalf any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by its employee for whose tortious act or omission the claim against the local government is premised and a local government may only be held liable to the extent that a judgment could have been rendered against such an employee under this subtitle.

notice requirements; 4) good cause existed to waive the notice requirements; 5) notice was not required because the individual appellants were acting outside the scope of their employment; 6) because the Prince George's County Charter had waived governmental immunity, notice was not required to impose liability on the County; and 7) the notice requirements did not apply to violations of State constitutional rights.[24] On the damage caps contention, Longtin asserts: 1) the jury's finding of malice precluded application of the limits; 2) the damage award against the individual appellants was not capped; 3) because 2001 legislation purporting to cap damage claims against local governments could not retroactively impair the appellant's previously accrued claims, the caps did not apply in this case; and 4) the caps did not apply to any of the constitutional claims. Appellants urge rejection of all of these contentions. Thankfully, for reasons set forth below, we believe there is no need to address all or even most of these arguments.

The parties have devoted a great deal of attention to the question of whether the LGTCA's notice provision applies to State constitutional torts.[25] This is understandable because the County was liable for the entire compensatory damage award and was determined to have engaged in two constitutional violations.

The Court of Appeals has consistently said that the LGTCA and the Maryland Tort Claims Act (MTCA), Md.Code (1984, 2009 Repl.Vol.), §§ 12–101 of the State Government Article, *et seq.*, do not exclude State constitutional torts from their coverage. *See, e.g., Ashton v. Brown,* 339 Md. 70, 107–08 n. 19, 660 A.2d 447 (1995); *Ritchie v. Donnelly,* 324 Md. 344, 374 n. 14, 597 A.2d 432 (1991). *See also Thomas v. City of*

---

**24.** In this respect, Longtin argues that "applying the LGTCA notice provision to constitutional claims would violate the long-standing doctrine that the Constitution is supreme and controlling in the face of a contradictory statute."

**25.** We discuss the parties' contentions regarding the damage caps in section 3 of this opinion, *infra* at pp. 125–28, 988 A.2d at pp. 36–38.

*Annapolis,* 113 Md.App. 440, 457, 688 A.2d 448 (1997) (Stating that the LGTCA applies to "all torts without distinction, including intentional and constitutional torts"). Less clear is whether the restrictions of those statutes that would defeat all or partial recovery apply in every respect to State constitutional torts. *See, e.g., Lee v. Cline,* 384 Md. 245, 265 n. 4, 863 A.2d 297 (2004) (reserving issue of whether the damage caps of the MTCA can be applied to a monetary award for violations of the Maryland Constitution).[26]

On the one hand, the Court of Appeals has said that a State constitutional tort, such as one premised on a violation of a "self-executing" constitutional provision, like Article 24 of the Maryland Declaration of Rights, is enforceable in a common law action for damages. *Benson v. State,* 389 Md. 615, 631, 887 A.2d 525 (2005); *Widgeon v. Eastern Shore Hospital Center,* 300 Md. 520, 536, 479 A.2d 921 (1984). In addition, a State constitutional tort action cannot be defeated by the assertion of official or local government immunity. *See Clea v. City of Baltimore,* 312 Md. 662, 684, 541 A.2d 1303 (1988); *Ashton,* 339 Md. at 101–02, 660 A.2d 447.[27] Thus, it appears to exist independently of the LGTCA, which is premised on a *waiver* of governmental immunity.[28]

---

26. *Lee* also held that MTCA provisions conferring qualified immunity on employees could be applied in a State constitutional tort case, as long as the claimant is able to recover against the State. 384 Md. at 262, 863 A.2d 297. However, in *Benson v. State,* 389 Md. 615, 628, 887 A.2d 525 (2005), the Court of Appeals said that *Lee* did not hold "that all constitutional tort claims must comply with the requirements imposed by the MTCA." *See also infra* n. 28. In our view, these authorities make it clear that when it comes to State constitutional torts, there can be no easy reliance on a literal reading of either the MTCA or the LGTCA.

27. Maryland is only one of a "handful of states whose high court refuses to immunize constitutional torts." Jennifer Friesen, *State Constitutional Law* § 8:08(6) (4th ed.2006). *See also Dorwart v. Caraway,* 312 Mont. 1, 58 P.3d 128, 139 (2002) (In cases involving claims for violations of state constitutional rights, "most state courts which have considered the issue have followed the federal law of qualified immunity").

28. While the MTCA became law in 1981, the LGTCA was not enacted until 1987, three years after the Court of Appeals' decision in *Widgeon,*

On the other hand, at least in MTCA cases, the Court of Appeals has indicated that recovery against the State is available as long as the claimant "complies with the procedural requirements" of the Act. *Lee*, 384 Md. at 262, 863 A.2d 297. In addition, in *Md. Reclamation Assoc. v. Harford County*, 342 Md. 476, 492–93, 677 A.2d 567 (1996), the Court also emphasized that administrative exhaustion requirements apply even in cases of alleged State constitutional violations.[29] Finally, presumably the Court of Appeals, in concluding that constitutional torts were not excluded from the LGTCA and MTCA, intended that such coverage include more than just a deeper pocket for recovery and the protection of employees from individual liability. *But see Ashton*, 339 Md. at 108, 660 A.2d 447 (emphasizing that "[a]ny judgments rendered [for State constitutional torts] should, under the Local Government Tort Claims Act, be paid by the City and not the individual defendants").

The issue of the applicability *vel non* of tort claims act notice of claim requirements to State constitutional torts is one that has arisen in a number of other jurisdictions—always with the same result. Often citing constitutional concerns, these courts invariably have held that these procedural requirements are inapplicable to actions for violations of a state constitutional right. *See Garlanger v. Verbeke*, 223 F.Supp.2d 596, 602–04 (D.N.J.2002); *Moore Real Estate, Inc. v. Porter County Drainage Bd.*, 578 N.E.2d 380, 381 (Ind.Ct.App.1991);

---

which first recognized a damage action for State constitutional violations. As far as State constitutional torts are concerned, the MTCA and LGTCA differ as to their theories of immunity and liability. Unlike the MTCA, which makes an immune entity, the State, liable while statutorily immunizing employees, the LGTCA makes non-immune local governments liable for judgments obtained against employees who are not protected from suit, but are immunized from the execution of a judgment. Under the LGTCA, employees can still assert common law or statutory immunities as a defense. C & JP § 5-303(d). *But see Lee*, 384 Md. at 261–62, 863 A.2d 297 (explaining that official immunity may not be raised as a defense to a State constitutional tort).

29. Arguably, what happened here is the possibility of a belated administrative exhaustion, not failure to exhaust, because Longtin filed a notice of claim with the County.

*Dishman v. Neb. Pub. Power Dist.,* 240 Neb. 452, 482 N.W.2d 580, 582 (1992); *Greenway Dev. Co. v. Borough of Paramus,* 163 N.J. 546, 750 A.2d 764, 768, 770 (2000); *Baumler v. Town of Newstead,* 198 A.D.2d 777, 604 N.Y.S.2d 372, 373 (N.Y.App. Div.1993); *Wolff v. Sec. of S.D. Game, Fish & Parks Dept.,* 544 N.W.2d 531, 535 (S.D.1996); *Heughs Land, L.L.C. v. Holladay City,* 113 P.3d 1024, 1027 (Utah Ct.App.2005).[30]

Some of these decisions, *see, e.g., Greenway Dev. Co.,* 750 A.2d at 770 and *Moore Real Estate,* 578 N.E.2d at 381,[31] rely on the decision of the U.S. Supreme Court in *Felder v. Casey,* 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988). There, the Court held that a state tort claims act 4–month notice of claim requirement could not be applied to an action under 42 U.S.C. § 1983 for violation of an individual's federal constitutional rights. *Id.* at 138, 108 S.Ct. 2302. Speaking for the Court, Justice Brennan said that federal civil rights actions "exist independent of any other legal or administrative relief that may be available as a matter of federal or state law." *Id.* at 148, 108 S.Ct. 2302. (*citing Burnett v. Grattan,* 468 U.S. 42, 50, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984))[32]; that a notice of

---

30. In at least three cases, this Court, without comment, has applied notice of claim requirements to claims that included State constitutional violations. *See Wilbon v. Hunsicker,* 172 Md.App. 181, 913 A.2d 678 (2006); *White v. Prince George's County,* 163 Md.App. 129, 877 A.2d 1129 (2005); *Chappelle v. McCarter,* 162 Md.App. 163, 873 A.2d 458 (2005). In none of these cases did the parties raise the issue presented by Longtin here. In *Williams v. Board of Trustees of Frederick Community College,* Civ. Act. No. CCB–03–cv–2123, 2004 WL 45517, 2004 U.S. Dist. LEXIS 203 (D.Md. Jan. 8, 2004), the U.S. District Court, while dismissing a common law tort claim for noncompliance with the LGTCA notice requirement, declined to do so with respect to alleged violations of the Maryland Constitution.

31. These state court decisions, in the strongest (and almost identical) terms, reject application of notice of claim requirements. *Moore Real Estate,* 578 N.E.2d at 381 ("The Board may not use a state statute, the tort claims act, to trump the constitutional rights of Moore."); *Greenway Dev. Co.,* 750 A.2d at 770 ("A public entity may not use a state statute, such as the TCA, to abrogate a claimant's constitutional rights.").

32. *Burnett* rejected the State of Maryland's contention that a six-month administrative complaint requirement applied to a federal equal protection claim advanced under 42 U.S.C. § 1983.

claim requirement mirrored a conferral of immunity, 487 U.S. at 142, 108 S.Ct. 2302; that "[m]any civil rights victims ... will fail to appreciate the compensable nature of their injuries within the 4–month window," *id.* at 146, 108 S.Ct. 2302; and that the state statute "burden[ed]" the exercise of the rights of civil rights victims. *Id.* at 141, 108 S.Ct. 2302. Pointing out the relative complexity of some constitutional claims, Justice Brennan said:

> [M]any other deprivations, such as those involving denial of due process or of equal protection, will be far more subtle. In the latter, and by no means negligible, category of constitutional injuries, victims will frequently fail to recognize within the 4–month statutory period that they have been wronged at all.

*Id.* at 146 n. 3, 108 S.Ct. 2302.

These points are particularly telling here, because the Court of Appeals has declared Article 24 of the Maryland Declaration of Rights to be self-executing and has recognized that there is no official or local governmental immunity from a State constitutional tort. *See* n. 27 and accompanying text. Moreover, if the four and six-month periods of *Felder* and *Burnett* were deemed too short for a plaintiff's assertion of a 14th Amendment violation, it would seem to follow that the six-month notice of claim period of C & JP § 5–304(b) is too short for the Maryland constitutional analog to the 14th Amendment—Article 24 of the Declaration of Rights.

## 2. The Good Cause Issue

■■ Mindful of our obligation to avoid unnecessarily deciding constitutional questions, *see Davis v. State,* 294 Md. 370, 377, 451 A.2d 107 (1982), including those premised on the inapplicability of a statute on constitutional grounds, we leave for another day the issue of whether it may or may not be possible to accommodate the special circumstances of State constitutional torts with the notice provisions of the LGTCA.[33]

---

**33.** One theory that Longtin has advanced to "cut to the chase" on the notice of claim issues and to allow us to avoid his constitutional attack

We believe the notice of claim issue can be resolved on the much narrower ground decided by the circuit court, *viz.* that good cause existed to excuse timely compliance with regard to each of Longtin's claims.

Although not raised by "motion" as contemplated by subsection (d), Longtin, in repeated filings, sought to invoke the good cause exception, and the circuit court, by explicitly finding no prejudice to the appellants, clearly relied upon § 5–304(d) in rejecting their notice of claim defense.[34] They contend that the circuit court's good cause finding is inconsistent with three cases: *Heron v. Strader*, 361 Md. 258, 761 A.2d 56 (2000); *Wilbon*, 172 Md.App. 181, 913 A.2d 678; *White*, 163 Md.App. 129, 877 A.2d 1129. Each of these cases state that good cause exists when the claimant has presented his claim with the degree of diligence that an ordinary prudent person would have exercised under the same or similar circumstances. *Heron*, 361 Md. at 271, 761 A.2d 56; *Wilbon*, 172 Md.App. at 205, 913 A.2d 678; *White*, 163 Md.App. at 150–51, 877 A.2d 1129. Each also notes the *Heron* factors, *i.e.*, the

---

on the LGTCA, is application of the "general verdict rule," *Tavaglione v. Billings*, 4 Cal.4th 1150, 17 Cal.Rptr.2d 608, 847 P.2d 574, 579 (1993), or the "two issue" rule, *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1278 (4th Cir.1994). Under this doctrine, where several counts are tried, a general verdict will be sustained if any one count is supported by substantial evidence and is unaffected by error. *See* 5 Am.Jur.2d *appellate Review* § 776 (2007). Thus, he argues that we need only find this malicious prosecution claim to be timely to uphold the entire compensatory damage award. Although the general verdict rule may be a useful rule of appellate jurisprudence in other jurisdictions, *see McCloud v. Roy Riegels Chemicals*, 20 Cal.App.3d 928, 97 Cal.Rptr. 910, 915 (1971), it is not the law in Maryland. Like federal caselaw, *see Maryland v. Baldwin*, 112 U.S. 490, 493, 5 S.Ct. 278, 28 L.Ed. 822 (1884), Maryland follows the rule that when one claim is overturned in a multiple claim case with a general jury verdict, an appellate court cannot possibly determine which part of the award was apportioned among the claims and a new trial must be ordered. *See Batson v. Shiflett*, 325 Md. 684, 737–38, 602 A.2d 1191 (1992); *Pantazes v. Pantazes*, 77 Md.App. 712, 726, 551 A.2d 916 (1989).

**34.** Appellants do not argue that the circuit court erred in finding that the County and the police officers were not prejudiced by any delay in giving notice.

earmarks of good cause. *Heron,* 361 Md. at 272, 761 A.2d 56; *Wilbon,* 172 Md.App. at 205–06, 913 A.2d 678; *White,* 163 Md.App. at 152, 877 A.2d 1129. These were summarized in *Wilbon:*

> excusable neglect or mistake (generally determined in reference to a reasonably prudent person standard), [2] serious physical or mental injury and/or location out-of-state, [3] the inability to retain counsel in cases involving complex litigation, ... [4] ignorance of the statutory notice requirement[,] or [5] misleading representations made by [a] representative of the local government.

172 Md.App. at 205–06, 913 A.2d 678 (Quotations and citations omitted.) [35]

Appellants argue that none of these conditions are present here. They also point to the holding in *Heron* that "the pendency of criminal proceedings" against the claimant does not constitute good cause. 361 Md. at 272, 761 A.2d 56.[36] In addition, in *White* and *Wilbon,* the presence of an ongoing police investigation into a brutality complaint did not excuse notice defectively given to the wrong entity. *White,* 163 Md.App. at 157, 877 A.2d 1129; *Wilbon,* 172 Md.App. at 210, 913 A.2d 678.[37]

---

**35.** As is apparent from our discussion, *infra,* we do not believe the *Heron* factors were intended to cover the universe of "good cause" scenarios.

**36.** In *Heron,* the claimant was charged with resisting arrest, obstructing the police and disorderly conduct. He was released two days after being charged, yet did not file a notice of claim until 8 months later. *Heron v. Strader,* 129 Md.App. 709, 716 (1999) (mem.). He also advanced no State constitutional claim. 361 Md. at 261 n. 2, 761 A.2d 56.

**37.** White, who was arrested for and later convicted of burglary, was incarcerated during the entire notice of claim period. He unsuccessfully argued that this fact, coupled with the alleged statement of an internal affairs investigator that he should take no action until the conclusion of the investigation into injuries inflicted by police upon his arrest excused any delay. *Id.* at 149, 877 A.2d 1129. In *Wilbon,* the pendency of a civilian review board investigation of a complaint by a woman whose son died in police custody was held not to justify a delay

These cases have little in common with the situation presented here. Longtin was not charged with burglary or a disorderly conduct offense, but murder in the first degree with the possibility of a double life sentence. Unlike Heron, he was not quickly released. Unlike White, he was not justifiably incarcerated, complaining of an ancillary constitutional violation. Longtin alleged and the jury found that agents of the County lied and withheld exculpatory DNA evidence to keep him incarcerated. If we assume that the 180–day notice period for most of the tort claims ran from the date he was arrested, he was not released until more than two months after the statutory period had expired. He was not made aware of the withholding of the DNA evidence—a key component of the alleged due process violation—until much later. Had Longtin filed his notice of claim in April 2000, while incarcerated, the false charges and the withholding of DNA evidence would likely have skewered any investigation or resolution of his claim.

Even if Longtin's State constitutional allegations were not factored into the equation, it is hard to disagree with the circuit court's determination that "the facts in this case are sufficient" to defeat the appellants' notice defense.[38] In short, an "ordinary prudent person" in Longtin's position could not have given notice by the 180th day. Thus, we conclude that, even if notice on any or all of Longtin's claims against the County and the individual appellants were untimely, the circuit court did not abuse its discretion in finding that good cause existed to excuse any delay.[39]

---

in filing a notice of claim. *Id.* at 187, 210–11, 913 A.2d 678. While both plaintiffs alleged state constitutional violations, neither argued the constitutional inapplicability of the notice requirement. *See supra* n. 30.

38. In *Wilbon*, 172 Md.App. at 211, 913 A.2d 678, we noted:
 We are mindful of the broad discretion accorded to trial judges in the determination of whether good cause exists to waive the notice requirement under the LGTCA. We also recognize that almost all of the appellate decisions in Maryland on the issue of good cause have held that the trial judge did not abuse his or her discretion.

39. We need not decide whether some of Longtin's claims could have been considered timely on other grounds. For example, a "continuing

### 3. The LGTCA Damage Caps

 Our conclusion that it was not error for the jury to award damages against the County for violation of Longtin's constitutional right to due process does not resolve the issue of whether the amount of the compensatory damage award— $5,025,000—was proper.[40] Appellants argue that under the LGTCA, the court was obligated to reduce the compensatory damages to $200,000. *See supra* n. 23. Among other things, Longtin contends that the statutory damage caps can never be applied to damages for violations of the State Constitution. While Longtin raises a serious question, *cf. Felder*, 487 U.S. at 142, 108 S.Ct. 2302 (stating that a State law "that limits the amount recoverable in suits against local governments" cannot apply in a federal civil rights action); *Lee*, 384 Md. at 265 n. 4, 863 A.2d 297 (reserving issue of whether the MTCA damage caps can be applied to a State constitutional tort), we believe the correctness of the amount of the damages can be resolved on a narrower basis, *viz.* at the time Longtin's action accrued, the caps did not apply to damages from his State constitutional claims.

In 1999 and 2000, during the period of Longtin's interrogation, arrest, incarceration and release, Prince George's County had no immunity, statutory or otherwise, from constitutional torts. *Housing Auth. of Baltimore City v. Crystal Bennett*, 359 Md. 356, 368–69, 754 A.2d 367 (2000) (collecting cases). In

violation theory" has been said to apply to a pattern or practice claim. *See McAleese v. Brennan*, 483 F.3d 206, 218 (3rd Cir.2007). And courts are divided on when a cause of action accrues for civil conspiracy, some indicating that a limitations period runs from the last overt action causing damage. *See generally Flowers v. Carville*, 292 F.Supp.2d 1225, 1229 (D.Nev.2003); M.C. Dransfield, Annotation, *When does statute of limitations begin to run against civil action or criminal prosecution for conspiracy*, 62 A.L.R.2d 1369 (1958). Finally, to the extent Longtin's Article 24 Due Process claim mirrors his concededly timely common law malicious prosecution count, the State constitutional claim would seem to equally comply with notice requirements. *See Crespo v. New York City Police Comm.*, 930 F.Supp. 109, 117 (S.D.N.Y.1996).

**40.** Longtin has not challenged the circuit court's reduction of compensatory damages from $5.2 million to $5.025 million.

*Bennett,* which involved local governmental liability under State housing authority laws, the Court of Appeals noted: "It would not be a reasonable construction of the [LGTCA] ... to apply the monetary caps to tort actions directly against local governments when the bases for such actions are enactments of the General Assembly, state common law, the state constitution, or federal law." *Id.* at 373–74, 754 A.2d 367.

In direct response to the *Bennett* decision, the General Assembly in 2001 passed emergency legislation, which, according to its title, was intended to "[clarify] that the monetary limits on the liability of a local government under the [LGTCA] apply to claims against local governments when named as defendants [and] that the monetary limits under the [LGTCA] apply to tort judgments for which local governments are liable...." Ch. 286, Laws of 2001 (HB 942). The legislation, which took effect upon the Governor's signature on April 20, 2001, reenacted without change C & JP § 5–303, but provided in an uncodified Section 2:

> That it is the intent of the General Assembly that the total liability of a local government, directly or otherwise, in an action arising from tortious acts or omissions, may not exceed the limits on liability stated in § 5–303(a) of the Courts and Judicial Proceedings Article.

Finally, in an uncodified Section 3, the measure stated:

> That this Act shall apply to any claim for damages under § 5–303 of the Courts and Judicial Proceedings Article in a case pending on the effective date of this Act and arising from events occurring on or after July 1, 1987.

The measure made no direct reference to constitutional torts.

In bill review letters dated April 19 and April 23, 2001, Attorney General J. Joseph Curran, Jr. concluded that the legislation's retroactive application was "constitutionally defensible" against a contention that it violated due process by interfering with a vested right in a cause of action. However, the April 23rd bill review letter noted that the Court of Appeals had agreed to hear *Dua v. Comcast,* 360 Md. 485, 759 A.2d 230 (2000) (mem.) and that the outcome of that case

"could have some bearing on the constitutionality of the retroactivity claimed in the bill."

The Attorney General's prediction was correct. In *Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 805 A.2d 1061 (2002), the Court of Appeals said that "there normally is a vested property right in a cause of action which has accrued prior to the legislative action," *id.* at 633, 805 A.2d 1061, and invalidated two statutes that retroactively abrogated plaintiffs' "rights to particular sums of money" as well as their "causes of action in pending cases." *Id.* at 642, 805 A.2d 1061. Appellants might argue that *Dua* was a case involving retroactive abrogation of a cause of action, rather than retroactive imposition of a damage cap that merely reduced recovery. *Cf. Murphy v. Edmonds*, 325 Md. 342, 362, 601 A.2d 102 (1992) (upholding the prospective imposition of non-economic damage caps in private litigation). However, pre-and post-*Dua* cases recognize that the retroactive grant of governmental immunity "might transgress a vested right." *Allstate Ins. Co. v. Kim*, 376 Md. 276, 296, 829 A.2d 611 (2003); *see also WSSC v. Riverdale Fire Co.*, 308 Md. 556, 569, 520 A.2d 1319 (1987) (stating that retroactive imposition of immunity "would cut off fully accrued causes of action for compensatory damages."). Here, what was at stake was a *fully* accrued cause of action for *complete* recovery for constitutional violations that were not previously subject to an assertion of either all or partial local government immunity. Undoubtedly, Longtin had a vested right in such a cause of action prior to the enactment of Chapter 286.

■ Appellants emphasize that the 2001 legislation was designed to be expressly retroactive to cases "arising from events occurring on or after July 1, 1987." However, as a matter of statutory construction, if not constitutional law, a statute, even if intended to apply retroactively, will not be given that effect if it would take vested rights. *Dua*, 370 Md. at 628, 805 A.2d 1061; *see also WSSC*, 308 Md. at 569, 520 A.2d 1319 (stating that a construction of a statute retroactively conferring governmental immunity to cut off fully accrued

causes "is to be avoided"). Appellants' attempt to justify retroactive application of the 2001 legislation as "remedial" fails for the same reason. *See Langston v. Riffe,* 359 Md. 396, 408, 754 A.2d 389 (2000) (stating that generally, a remedial statute may not be applied retroactively if it would interfere with vested or substantive rights); *WSSC,* 308 Md. at 560, 520 A.2d 1319 (noting that the granting of immunity affects more than mere change of remedy).

On the basis of these authorities, we conclude that, regardless of the later enactment of Chapter 286, at the time Longtin's claim had accrued, the LGTA damage caps (and the partial immunity they would have provided the County) did not apply to appellee's action for State constitutional violations. This is true whether the action was predicated on a *respondeat superior* theory or otherwise.

### 4. The Pattern or Practice Claim

██ The County challenges both the legal and evidentiary support for Longtin's "pattern or practice" claim, which he premised on a violation of Article 24 of the Declaration of Rights.[41]

Before addressing the County's contentions, we believe a brief history of these terms would be helpful. Generally, a "pattern or practice" claim falls into two categories.[42] The first type is a long-recognized remedy for unlawful employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (and other federal antidiscrimination statutes).[43] Such a suit focuses on multiple incidents of

---

41. Because the County's liability is integral to complete resolution of this case, *see* pp. 125–28, 988 A.2d at pp. 36-38, including an evidentiary issue, *see infra* pp. 134–36, 988 A.2d at pp. 42–43, we address the appellants' challenge to Longtin's second theory of County liability, even though it may be possible to base our affirmance on Longtin's first theory, *viz. respondeat superior.*

42. The more common use of the term is "pattern or practice," rather than "pattern and practice." In this opinion, we will refer to the more common usage.

43. The federal government can bring a pattern or practice suit under 42 U.S.C. § 2000e–6. An individual can assert a pattern or practice

systematic discrimination against individuals in a protected class. *See, e.g., Gaston v. New York City Dept. of Health,* 432 F.Supp.2d 321 (S.D.N.Y.2006). A second category is litigation under the 1871 federal Civil Rights Act, 42 U.S.C. § 1983.[44] Section 1983's focus on a local government's "policies and customs" came to establish a dividing line between *respondeat superior* immunity and what is often termed pattern or practice liability. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 692–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, *Monell* spawned countless lawsuits aimed at allegedly unconstitutional municipal policies and customs, including those targeting systematic police misconduct. *See, e.g., Kammeyer v. City of Sharonville,* 311 F.Supp.2d 653 (S.D.Ohio 2003).

Noteworthy is Congress' enactment in 1994 of legislation governing law enforcement misconduct. This statute, 42 U.S.C. § 14141, provides:

(a) It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration

---

disparate treatment claim by filing suit under 42 U.S.C. § 2000e–5. *See Robinson v. Metro–North Commuter R.R.,* 267 F.3d 147, 159 (2d Cir. 2001).

**44.** This statute provides:

Every person who, *under color of any statute, ordinance, regulation, custom, or usage,* of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia. (Emphasis added.)

of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

(b) Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1) has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

According to the U.S. Department of Justice's *Civil Rights Resource Manual*, at 5, this statute authorizes the Department to

examine a wide variety of potential misconduct including: unnecessary use of deadly force; excessive force; discriminatory harassment; improper stops, searches, arrests, or failures to provide service based on impermissible criteria such as race, national origin, or gender; coercive sexual conduct; and retaliation against citizens alleging misconduct. Examples of departmental practices that may be actionable because they result in misconduct include: failure to investigate allegations of officer misconduct; failure to discipline officers who have engaged in misconduct; engaging in a code of silence to protect persons guilty of misconduct; and a failure to train personnel in proper law enforcement techniques.

With this background in mind, we turn to the County's contentions. Appellant argues that nothing in the language of Article 24 or in Maryland caselaw gives rise to a state constitutional claim against a local government for an alleged pattern or practice violation. Reversing the dividing line in *Monell,* the County seems to contend that if a local government is liable for a constitutional tort on a *respondeat superior* theory, it cannot at the same time be liable for a pattern or practice violation.

In our view, these arguments miss the mark. Just as a county ordinance can violate the state constitution, so too, in the words of § 1983, can a "regulation, custom, or usage." In addition, given the almost uniquely expansive reach of Mary-

land's constitutional tort remedy, where no official or local governmental immunity is possible, *see* n. 27 and accompanying text, we think it highly unlikely that Article 24 contains any exemption from liability for an unconstitutional pattern or practice. Finally, we note that the Court of Appeals in *DiPino v. Davis,* 354 Md. 18, 53, 729 A.2d 354 (1999), set forth the rationale for making local governments liable for the constitutional torts of their employees. Quoting favorably from *Brown v. State,* 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1142–43 (1996), it recognized that the government

> is appropriately held answerable for the acts of its officers and employees because it can avoid such misconduct by adequate training and supervision and avoid its repetition by discharging or disciplining negligent or incompetent employees.

According to the U.S. Department of Justice, *see supra,* pp. 129–30, 988 A.2d at p. 39, violation of these duties can be trademarks of a pattern or practice of police misconduct.[45] In our view, these deficiencies, when coupled with a record such

---

**45.** In *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the U.S. Supreme Court held that a municipality is liable for a failure to train its police force when this failure reflects a deliberate indifference to the constitutional rights of its citizens. In *Canton,* the Court also noted:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

Because Longtin's case is premised on more than just a failure to train, there is no need to decide whether *Canton's* deliberate indifference standard should be applied in a pattern or practice claim under Article 24. Nor need we determine the impact of a County ordinance requiring its police officers to receive such training "as required by the County Executive and Chief of Police." Prince George's County Code § 18–138 (2003).

as that presented here, can lead to liability by a local government for a violation of Article 24.[46]

■ The County contends that even if a pattern or practice claim exists under Article 24, there was insufficient evidence in this case to warrant liability. It asserts that Longtin presented no evidence of an unconstitutional policy, practice or custom that led to the constitutional injuries he suffered, and that he failed to prove anything more than a single instance of unconstitutional activity.

Although even a single decision by municipal "policymakers" can constitute a policy whose unconstitutionality can lead to liability, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), there is some support for the County's contention that a single incident by a non-policymaking police officer cannot lead to *Monell*-type liability. *See Oklahoma City v. Tuttle* (plurality opinion); see also Civil Rights Resource Manual, supra at 5 (stating that proof of a "single, insignificant, isolated action would not justify a finding of a pattern or practice").[47] However, Longtin presented much more in support of his pattern or practice claim. He introduced evidence of lengthy interrogations of other individuals (of 60 hours and 72 hours); another dubious confession and erroneous incarceration; an official police training manual urging constitutionally questionable actions with respect to the conduct of interrogations, *Miranda* warnings, and the right to counsel, which the individual officers appeared to have followed "by the book"; expert testimony regarding violations of commonly-accepted police practices, evidence of serial violations of multiple constitutional rights by a number of offi-

---

**46.** We also note that Michigan courts have recognized a *Monell*-type action for certain violations of that State's constitution. *See Smith v. State Dep't. of Pub. Health,* 428 Mich. 540, 410 N.W.2d 749, 750 (1987); *Johnson v. Wayne County,* 213 Mich.App. 143, 540 N.W.2d 66, 69–70 (1995).

**47.** In this case, the trial judge instructed the jury that to prevail on his pattern or practice claim, Longtin had to show "more than one" constitutional violation and "incidents other than ones involving the Plaintiff."

cers;[48] and a blurring of the line between presumptive innocence and pre-determined guilt. *See supra* pp. 113–15, 988 A.2d at pp. 29–30. The jury could have reasonably concluded that such evidence demonstrated a pattern or practice or a custom of unconstitutional police conduct.

### 5. Evidentiary Issues

The appellants complain of four evidentiary rulings of the trial court: 1) admission of DNA evidence regarding Longtin and Oesby; 2) introduction of evidence that Oesby was ultimately arrested and convicted; 3) introduction of other police interviews, interrogations, and the outcomes of other criminal cases to prove the pattern or practice claim; and 4) the limitation of hearsay testimony by appellants' expert witness regarding the existence of probable cause to arrest and detain Longtin. In our view, none of these evidentiary rulings warrants reversal of the jury's verdict.

### A. Standard of Review

We generally review a trial court's ruling on the admissibility of evidence under the abuse of discretion standard, giving more deference to the judge's discretionary weighing of relevance than a ruling premised on a pure conclusion of law. *Brown v. Daniel Realty Co.*, 409 Md. 565, 583, 976 A.2d 300 (2009). In addition, even if the evidentiary ruling was manifestly wrong, it will not be set aside unless the appellant can show the probability of prejudice. *Id.* at 584, 976 A.2d 300. Finally, to preserve a challenge to the admission of evidence, ordinarily, a party must object each time the evidence is introduced. *Pulte Home Corp. v. Parex, Inc.*, 174 Md.App. 681, 763–64 (2007).

---

**48.** *See* A. Lurie, Note, *Ganging Up On Police Brutality: Municipal Liability for the Unconstitutional Actions of Multiple Police Officers Under 42 U.S.C. § 1983*, 21 Cardozo L.Rev.2087, 2090 (2000) ("The Supreme Court should allow an inference of municipal liability under section 1983 when multiple officers act in concert to violate a plaintiff's constitutional rights, even if the liability is based on a single incident.").

## B. DNA Evidence

In the circuit court, appellants filed a motion in limine to prohibit introduction of the DNA evidence because it was not available when the district court commissioner independently determined that probable cause existed to arrest and hold Longtin.[49] This motion was denied. When the evidence was later disclosed in testimony, appellants made no further objection. Under these circumstances, the motion in limine will not preserve appellants' objection. *Pulte Home Corp.*, 174 Md.App. at 763, 923 A.2d 971.

Even if the issue had been preserved, Longtin contends that the DNA evidence was admissible to show that probable cause was destroyed. He points to *State v. Dett*, 391 Md. 81, 94, 891 A.2d 1113 (2006), which states:

[T]he legal justification for the arrest based on the identity of the arrestee can dissipate over time. The detaining authority may come into possession of information, not known at the time of arrest or not known at some earlier point in the detention, which, by establishing that the person being detained is not, in fact, the person authorized to be detained, may cause the legal justification relating to identity to disappear.

In our view, this is one of a number of bases that would have justified the admission of the DNA results. The DNA evidence was exculpatory. The failure of Detective Herndon to disclose this evidence in January of 2000 and his delay in providing the Maryland Police Crime Laboratory with Oesby's DNA was clearly relevant to Longtin's constitutional claim. *State v. Williams*, 392 Md. 194, 198, 896 A.2d 973 (2006) (stating that due process requires the State to disclose exculpatory evidence). Finally, we do not believe that the appellants' contention that the district court commissioner's determination of probable cause remains unassailable when Longtin has alleged and proven that the charging document was

---

**49.** The motion in limine also sought to prevent the introduction of evidence of Oesby's crimes and convictions.

misleading and the testimony before the commissioner was false. *See supra* pp. 111–13, 988 A.2d at pp. 28–29. *See Davis v. DiPino,* 121 Md.App. 28, 78, 708 A.2d 357 (1998) (A police officer is not automatically protected from liability for an unconstitutional arrest merely because a judicial officer ultimately determines to issue a warrant.), *aff'd. in part, vacated in part,* 354 Md. 18, 729 A.2d 354 (1999); *Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir.1988) ("If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials who they have defrauded.").

For these reasons, we reject appellants' challenge to the circuit court's admission of the DNA evidence.

## Oesby's Arrest and Conviction

■ It would appear that the appellants' attack on the introduction into evidence of Oesby's arrest and conviction for Zinetti's murder was not preserved for the same reasons, discussed, *supra* at pp. 133–34, 988 A.2d at pp. 41–42. In any event, at the very least, such evidence was relevant to Longtin's claim that he could not have been the murderer and that Oesby was the most likely suspect. *See supra* n. 18.

### D. Other Crimes

■ Contrary to appellants' objection, the admission of other police interviews, interrogations and the outcome of other criminal cases was clearly related to Longtin's pattern or practice claim, which we have previously determined to be both authorized and evidentially sufficient. *See* pp. 128–33, 988 A.2d at pp. 38–41. Nor were the individual officers harmed by the introduction of this evidence, because the trial court specifically instructed the jury to consider police interviews and interrogations in other cases only in connection with the pattern or practice claim against the County.[50]

---

50. The court told the jury:

### E. Hearsay Testimony

■ Noting that hearsay evidence is admissible to establish that police have probable cause to arrest, appellants argue that their expert was impermissibly limited in testifying regarding notes in Detective Herndon's case file of hearsay statements of certain persons about Longtin's alleged propensity for violence. None of the officers testified that this hearsay formed the basis for probable cause and it did not find its way into the Statement of Probable Cause. Nevertheless the court conditionally allowed the expert to make some reference to this information in the file, noting:

> I'm concerned about the second and third level hearsay we're about to get into, which I don't think is admissible that way. Now, if he wants to say there was some violent propensity that the Police had investigated or had knowledge of it, I may let him say that, but that's conditioned on you bringing the witnesses in here.

Counsel for appellants then stated:

> Yes Your Honor. And in which case, I guess, I'm going down that road. If that's the limitation Your Honor is giving me, then, that's where I'm going.

Eventually, the expert testified about the statements in the investigatory file, but the witnesses were never identified nor called to testify. Under these circumstances, we do not see how appellants can complain about the trial judge's fairminded response to what could have been viewed as speculative and highly prejudicial hearsay evidence.

For these reasons, we find no error in the court's evidentiary rulings.

---

You are instructed that evidence regarding any other interviews or interrogations is relevant only to Plaintiff's pattern and practice claim. You are not to consider the evidence of other interviews or interrogations for any reason other than that specific pattern and practice claim.

## 6. Jury Instructions

Appellants contend that the trial judge erroneously instructed the jury in six instances. Specifically, they urge us to find errors in instructions on due process, the pattern or practice claim, probable cause, the intentional infliction of emotional distress claim, the termination of prosecution element of the malicious prosecution claim and the malice requirement for punitive damages. For reasons set forth below, we reject these contentions.

### A. Standard of Review

In *Wegad v. Howard St. Jewelers*, 326 Md. 409, 414, 605 A.2d 123 (1992), the Court of Appeals said:

[T]o rule upon the propriety of denying a requested jury instruction, a reviewing court must determine whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given.

*See also* Md. Rule 2–520(e).

When considering the adequacy of jury instructions, we examine the charge as a whole. *Blanchfield v. Dennis*, 292 Md. 319, 322, 438 A.2d 1330 n. 3 (1982). In addition, under Md. Rule 2–520(e), "no party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection."[51] Finally, the burden of showing reversible error and prejudice from an instruction rests with the complaining party. *Landon v. Zorn*, 389 Md. 206, 225, 884 A.2d 142 (2005).

---

**51.** Longtin contends that appellants failed to preserve their challenges to the six instructions. While one may question whether appellants stated "distinctly" the matter to which they objected and fully elaborated the "grounds" of their objections, we believe they substantially complied with Md. Rule 2-520(e).

## B. Due Process

The circuit court instructed the jury that for Longtin to prevail he had to show that the appellants' denial of due process "shock[ed] the consci[ence]." The trial judge elaborated on this instruction by grounding it in the allegations of the case.[52]

Appellants do not contend that the "shock the conscience" test is an erroneous standard for determining a substantive due process violation. *See Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Rather, they assert that the court should have amplified the instruction along the lines they had proposed in order to emphasize that the unconstitutional conduct must be "brutal" and "inhumane," which they characterize as a "high[er] level of culpability." We disagree.

"Shock the conscience" already denotes a very high standard of culpability[53] and is so elemental a formulation that further refinement might only confuse a jury. In our view, appellants' rejected instruction was "fairly covered" by the instruction given. Md. Rule 2–520(c).[54]

---

52. The court added:

 In this case, the Plaintiff has alleged that his due process rights were violated by unreasonably long interrogation, denial of sleep and food, violation of the 24 hour rule, denial of the right to counsel, detention without probable cause, withholding evidence in court proceedings, and holding the Defendant without probable cause.... In this case, you should look at the totality of the circumstances in deciding whether or not there is a violation of Plaintiff's right to due process. In addition, the court said:

 I instruct you that, to establish a claim under the Maryland Declaration of Rights, the Plaintiff must show that the Defendants acted intentionally or recklessly. If you find that the acts of a Defendant were merely negligent, then even if you find that the Plaintiff was injured as a result of those acts, you must return a verdict for the Defendant as to the Maryland Declaration of Rights count.

53. The court's additional instruction expressly indicated as much. *See supra* n. 52.

54. We need not reach Longtin's additional argument that the due process instruction is further clarified if considered along with the instructions on malice and intentional infliction of emotional distress.

## C. Pattern or Practice

■ The trial judge gave the following instruction on the pattern or practice claim:

> The Plaintiff alleges that the Defendants implemented a policy and practice of endorsing and encouraging unlawful and unconstitutional conduct. To succeed in a claim for a pattern or practice of improper conduct, a Plaintiff must establish an unconstitutional pattern of conduct, including incidents other than ones involving the Plaintiff, to give rise to the inference that an unconstitutional custom, policy, or practice exists or the Plaintiff must show other evidence of the actual unconstitutional policy. When a Plaintiff chooses to challenge a County's unconstitutional policy by establishing a widespread practice, more than one violation must be shown.

> Whether an official practice or custom exists is a question of fact for you to determine. A practice or custom is a persistent, widespread course of conduct by municipal officials (or employees) that has become a traditional way of carrying out policy, and has acquired the force of law, even though the municipality has not formally adopted or announced the custom.

Appellants challenge this instruction because it does not contain some elements of their proposed instruction, *viz.* knowledge of municipal officials of the unconstitutional custom or usage, their deliberate indifference to correction, and a causal connection between this knowledge and lack of correction and the specific violation. In our view, however, the court's instruction was both accurate and sufficiently detailed, given the nascent state of this cause of action in Maryland. We reject appellants' invitation to use a barely-briefed battle over instructions [55] to resolve still-debated issues over the details of this cause of action. *See* supra n. 45.

---

**55.** Appellants make their argument in four sentences in their brief and in one sentence in their reply brief.

We find that the court's instruction "fairly covered" that proposed by the appellants.

### D. Probable Cause

 Appellants assert that the circuit court improperly instructed the jury on the proper definition of probable cause.[56]

At one point in the instructions, the court defined probable cause as "knowledge of facts and circumstances that would lead a reasonable person to believe the Plaintiff had committed the offense." This definition was taken from the Maryland Pattern Civil Jury Instructions for false imprisonment and arrest. *See* MPJI–Cv 15:6e.[57]

Appellants complain that the following definition was not given:

> Probable cause [is] measured by the circumstances as they reasonably appeared to [the officer] at the time when he initiated action. It is not dependent upon the actual state of the case as it may turn out upon subsequent investigation. The ultimate innocence of the arrestee is not determinative of the legitimacy of his arrest.

This proposed instruction was not entirely accurate because a malicious prosecution includes both the starting or "continuing" of a criminal proceeding without probable cause. MPJI– Cv 17:1. Moreover, the instruction viewed as a whole empha-

---

**56.** It is not clear from appellants' brief whether this issue is pressed solely on behalf of Detective Herndon—and solely with respect to the malicious prosecution claim—or on behalf of all appellants on all claims where probable cause was an element. This lack of clarity would appear to undermine the argument. *See* Md. Rule 2–520(e).

**57.** The court also told the jury:
> The Defendant acted without probable cause if the Defendant did not have any reasonable grounds to believe in the Plaintiff's guilt. Mere belief, however sincere, is not sufficient. There must be such grounds for belief founded upon the actual knowledge of acts as would influence the mind of a reasonable person.

This was taken from the Maryland Pattern Civil Jury Instructions for malicious prosecution. *See* MPJI–Cv 17:3.

sized the situation as it existed at the "start" or "instigation" of the proceeding. *See* MPJI–Cv 17:2 and MPJI–Cv 17:4.

Appellants have not met their burden in showing that their proposed instruction was not "fairly covered" by the court's instruction or that they suffered any prejudice.

### E. Intentional Infliction of Emotional Distress

 Although the circuit court followed the Maryland Pattern Civil Jury Instructions with respect to the tort of intentional infliction of emotional distress, MPJI–Cv 15:11, appellants contend that the instruction should have added that Longtin was required to show that he suffered "a severely disabling emotional response" to appellants' conduct. However, the pattern instruction requires that the emotional distress be "severe." [58] Thus, we do not see how the appellants' proffered instruction was not fairly covered by the court's instruction or how they could show prejudice.

### F. Termination of Prosecution

Appellants assert that the circuit court should have given the malicious prosecution instruction that "[o]nly [t]he State's Attorney may terminate a prosecution on a charge and dismiss the charge by entering a nolle prosequi on the record in open court." This is not a completely accurate description of how a prosecution may be terminated. *See* Comment B.2. to MPJI–Cv 17:1. Thus, there was no error in rejecting appellants' proposed instruction.

### G. Malice / Punitive Damages

 Appellants argue that the trial court should have added to the Maryland Pattern Civil Jury Instruction statements regarding punitive damages generally, MPJI–Cv 10:13, and malicious prosecution specifically, MPJI–Cv 10:18, particularly to specify that "[p]unitive damages can only be awarded

---

**58.** There is no doubt that wrongful incarceration can be actionable as an intentional infliction of emotional distress. *See Limone v. U.S.,* 579 F.3d 79 (1st Cir.2009) (upholding a highly-publicized $100 million judgment stemming from wrongful incarceration by FBI agents).

upon the showing of actual malice, which is characterized by fraud, ill will, spite, evil motive, conscious wrongdoing or intention to injure." Noteworthy is the trial court's instruction regarding malice in the context of "state torts":

> A police officer is not responsible for any State tort unless the Officer acted with malice toward that person. Malice exists when the officer intended to inflict an injury and acted with improper motivation or with ill will.

> \* \* \* \*

> Malice is the performance of an act without legal justification or excuse and with an evil or rancorous motive influenced by hate, the purpose of which is to deliberately and willfully injure another.

The verdict sheet also clearly required the jury to find malice before awarding punitive damages. Viewing the instructions as a whole, we believe they fairly covered appellants' proposed instruction. Nor do we find that they suffered any prejudice from this or any other challenged instruction.

## H. Reduction of Punitive Damages

 Longtin has cross-appealed the August 31, 2007 order of the circuit court reducing the punitive damages awarded by the jury against the individual officers. The issue presented by appellant is a narrow one: "Did the trial court improperly reduce punitive damages ... *sua sponte* without first providing notice or an opportunity to be heard on the issue?" [59]

The question is a troubling one. Although the circuit court appeared to suggest it should have granted a motion for

---

59. Longtin's brief also devotes some attention to the circuit court's weighing of factors supporting the punitive damages award. However, his reply brief states:

> The defense avers that a trial court's reduction of a punitive damage [award] is reviewed for abuse of discretion. Had the trial court provided notice and an opportunity to be heard and then gone on to apply the proper test outlined above, this would certainly be the case. However, the issue on appeal is not whether the trial court abused its discretion in applying these factors, but the facts that: 1) the trial court provided no notice or opportunity for the plaintiff to be heard

judgment of three of the officers on the punitive damages issue,[60] the appellants made no such argument at the time. Nor did they ask for a reduction in the punitive damage award in their post-trial motions. In addition, although there was a hearing on these motions, neither court nor counsel mentioned the excessiveness of the punitive damage awards. If the court had used the device of a remittur/new trial under Md. Rule 2–533, *see Battista v. Savings Bank of Baltimore,* 67 Md.App. 257, 273, 507 A.2d 203 (1986), to address the excessiveness of damages, it would have had to hold a hearing on the issue.[61] However, because the court reduced damages via a motion to revise under Md. Rule 2–535(a), even the hearing requirement of the rules would not have been triggered.

Longtin argues that because he has a vested property right in the judgment under Article 24 of the Maryland Declaration

prior to *sua sponte* striking more than $1 Million of the plaintiff's judgment; and 2) in doing so, the trial court failed to address all of the factors which must be addressed in deciding to strike such awards.

In light of the narrowness of the question presented, it is not at all clear that issue (2) is properly before us. In any event, we do not believe the court erred simply by focusing on the most salient or relevant of the punitive damage factors.

**60.** The trial judge's opinion states "Upon reconsideration, the Court finds that when viewed in the light most favorable to the plaintiff, there was insufficient evidence of actual malice to submit the issue to jury as to Detectives Harding, Frankenfield and Clark." With respect to Detective Herndon, the circuit judge found malice, but reduced the award upon consideration of such factors as the appellant's ability to pay, the size of the award, and his belief that deterrent value could still be achieved with a lower award.

**61.** Under Md. Rule 2–311(e), a circuit court may not grant a motion for new trial without a hearing. Presumably, if a judge was going to order a remittur *sua sponte,* this rule would seem to require a hearing. *Cf. Reubaum v. Custom Holding, Inc.,* 386 Md. 28, 46, 871 A.2d 554 (2005); Niemeyer, Schuett, Lynch and Bourne, *Maryland Rules Commentary* at 193 (3d Ed.2003) ("If the court has any expectancy of granting the motion, it should automatically order that a hearing be scheduled."); Fed.R.Civ.P. 59(d) (providing, in part: "After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion.").

of Rights, due process would mandate notice and an opportunity to be heard before the court could reduce the punitive damage awards, *sua sponte*. It may be true that in some instances due process requirements apply to sua sponte judicial actions. *See, e.g., Riffin v. Baltimore County*, 190 Md. App. 11, 985 A.2d 612 (2010) (holding that a circuit court may issue a prefiling order *sua sponte* against a vexatious litigant, but must afford notice and an opportunity to be heard). However, the timely filing of appellants' post-trial motions robbed the judgment of its finality and invested in the court the broad and well-established authority to revise its judgment *sua sponte*. *See PSC v. Wilson*, 389 Md. 27, 43–45, 882 A.2d 849 (2005). In short, under these circumstances, there can be no vested right in a non-final punitive damage award free of the exercise of a circuit court's revisory authority.

Longtin argues that his constitutional argument is supported by the decision of this Court in *Mona v. Mona Elec. Group, Inc.*, 176 Md.App. 672, 934 A.2d 450 (2007). There, we upheld the power of a circuit court to revise its judgment, *sua sponte*, and reduce a damage award. It so happened in that case the trial judge raised the issue at a hearing on a JNOV motion, then continued the proceeding to give the parties the opportunity to brief the question before ruling. *Id.* at 684, 934 A.2d 450. This was probably a wise course of action in *Mona* and would have been so here. However, nothing in *Mona* suggests that this procedure was constitutionally required.[62]

 More clearly established is that the due process right Longtin seeks to assert is the constitutional obligation of the

---

**62.** A cursory search of out-of-state authorities discloses two cases where federal appellate courts have indicated that notice and an opportunity to be heard was required when a district court *sua sponte* modified its judgment after the then-established deadline for post-trial motions. *Dr. Jose S. Belaval, Inc. v. Perez–Perdomo*, 465 F.3d 33, 37 (1st Cir.2006); *Chavez v. Balesh*, 704 F.2d 774, 777 (5th Cir.1983). *Cf. McDowell v. Celebrezze*, 310 F.2d 43, 44 (5th Cir.1962) (Holding that judge's *sua sponte* notice of rehearing filed one month after judgement complied with Fed.R.Civ.P. 60(b)). Here, however, as a result of timely-filed motions, the judgment was not final and the court's control over the proceeding was nearly plenary.

trial court to scrutinize a punitive damage award. Judicial review of a punitive damage award is a requirement of procedural due process. *Bowden v. Caldor, Inc.*, 350 Md. 4, 25, 710 A.2d 267 (1998). Thus, it could not have been completely unforeseeable that the circuit court would consider the question.[63] We also note that although the punitive damage reduction was not mentioned in appellants' post-trial filings, the key component of malice was an omnipresent issue in the case and appellants' counsel argued at length against the punitive damage award in his closing argument.[64]

Finally, we note that after the awards were reduced, Longtin did not file a motion to alter or amend that judgment under Md. Rule 2–534 and request a hearing on the propriety of the punitive damages reduction. For all of these reasons, we do not believe the circuit court erred when, *sua sponte*, it revised the judgment to reduce the punitive damages award, without providing Longtin notice and an opportunity to be heard on the issue.

## CONCLUSION

Thus, we find that the trial court committed no reversible error. Although we affirm the reduction of the punitive damage awards, we leave standing the $5,025,000 compensatory damage award against the County and the $50,000 punitive damage award against appellant Herndon.

---

**63.** Appellants did specifically challenge the property damage component of the compensatory damage award, arguably putting the general subject of damages into play.

**64.** In closing, appellees' counsel said:

There is no information that you gathered from two and a half weeks of trial that state[s] that any punitive damages should be given against any of those four Detectives.... There is no malice ... And there's also a rule here, if you ever get to the punitive damages, as to these four public servants. It's not designed to bankrupt them or to financially destroy them.... These are four civil servants with a long history with Prince George's County, within the police force, just investigating a murder....

JUDGMENT AFFIRMED. COSTS TO BE DIVIDED BETWEEN THE PARTIES: 4/5THS TO BE PAID BY APPELLANTS; 1/5TH TO BE PAID BY APPELLEE.